ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| ECC International LLC | ) | ASBCA Nos. 61176, 62029 |
| | ) | |
| Under Contract No.  W912UM-12-C-0058 | ) | |
| | ) | |

APPEARANCES FOR THE APPELLANT:     R. Dale Holmes, Esq.
    Cohen Seglias Pallas Greenhall &
      Furman PC
    Philadelphia, PA

    Michael A. Richard, Esq.
     Obermayer Rebmann Maxwell &
      Hippel LLP
    Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
    Engineer Chief Trial Attorney
   Paul B. Taylor, Esq.
   Paul L. Huhtanen, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Far East
    Seoul, Korea

OPINION BY ADMINISTRATIVE JUDGE STINSON

These consolidated appeals by ECC International, LLC (ECCI), challenge two contracting officer's final decisions.  The first, dated February 21, 2017, denied ECCI's June 22, 2016, claim, seeking $961,533, in alleged costs for the government's failure to provide a Cleared American Guard (CAG) and a Construction Security Technician (CST) during the project (ASBCA No. 61176 (61176) R4, tabs 1, 16).[1] The second, dated March 13, 2019, denied ECCI's November 28, 2018, claim, seeking $388,495, for an alleged change in Site Security Monitoring Services (SSMS)

---

[1] "61176 R4, tab___," refers to the government's appeal file (Board Rule 4) submitted in ASBCA No. 61176.  "62029 R4, tab ___," refers to the government's appeal file submitted in ASBCA No. 62029.  "Gov't supp. R4, tab ___," refers to the government's supplemental appeal file submitted in these consolidated appeals. "App. supp. R4, tab ___," refers to appellant's supplemental appeal file submitted in these consolidated appeals.

performed in certain areas of the project site (ASBCA No. 62029 (62029) R4, tabs 1, 18). The parties agreed to submit these appeal for a decision on the record without a hearing pursuant to Board Rule 11. Each party submitted initial and responsive briefs. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. For the reasons stated below, we deny both appeals.

FINDINGS OF FACT

1. On November 15, 2011, the United States Army Corps of Engineers (USACE), Far East District (FED), issued Solicitation No. W912UM-12-R-0002 (the Solicitation) requesting proposals for the construction of a two-story Brigade Headquarters (HQ) administrative building for the 501st Military Intelligence Brigade, United States Army Garrison (USAG) Humphreys, in Pyongtaek, South Korea (61176 R4, tab 4 at 2, 4). The building included a controlled access area (CAA) or Sensitive Compartmented Information Facility (SCIF) comprising approximately 25 percent of the structure -10,000 square feet out of 39,629 square feet (61176 R4, tab 4 at 2).

*Solicitation Amendment No. 2*

2. On February 22, 2012, the government issued Solicitation Amendment No. 0002 (61176 R4, tab 6 at 1). Amendment No. 0002 added language to Specification Section 01 22 00, "PAYMENT," specifically Contract Line Item Number (CLIN) 0006, "Site Security Monitoring Service (SSMS)" (61176 R4, tab 3 at 111-12, tab 6 at 2-3).[2] CLIN 0006 provides, in part:

> Site Security Monitoring Service will be paid for at the contract price. The contractor is responsible for hiring a security monitoring subcontractor to provide Site Security Monitoring Services (SSMS). The Site Security Monitoring Services (SSMS) Subcontractor shall furnish all personnel, tools, protective equipment and supplies to provide SSMS in accordance with rules, laws, regulations and security requirements as stated in the RFP documents.

(61176 R4, tab 3 at 112, tab 6 at 21)

---

[2] The copy of the specification set forth at 61176 R4, tab 3, incorporates specification language added by Amendment No. 0002. For context, we cite both documents.

3.  Amendment No. 0002 also added the following provision:

> j.  Site Security Personnel:  Provide cost breakdown by months to correspond to your schedule in accordance with Section 00120 Evaluation Factors for Award, FACTOR 5: PROJECT SCHEDULE (page 23 of 133):
>
> Cost breakdown will include man hours and labor costs including wages, labor burden, subsistence, lodging and other labor related costs.  Breakdown shall include the following personnel:
>
> > (1) Construction Surveillance Technicians (CSTs)
> > (2) Cleared American Guards (CAGs)
> > (3) Escorts
> > (4) Other security Labor
>
> (Updated, 17 Feb 12)

(61176 R4, tab 6 at 5)

4.  Amendment No. 0002 inserted into Specification Section 01 31 00, "CONSTRUCTION EXECUTION AND COORDINATION," the following provisions:

> 3.2 GOVERNMENT FURNISHED ITEMS
>
> > A.  The USG may provide equipment or material for either USG installation or contractor installation, designated as GFGI or GFCI, respectively.  In all cases, coordinate with the USG and plan to accommodate these items during the receiving, transporting, secure shipment and storage, material handling, and integration of the installation of same into the general works.  Support infrastructure for government-furnished items.  As an example, if the USG is to provide and install an alarm system, the contractor is to provide and install conduits, raceways, cables, terminal boxes, and source power.
>
> 3.3 GOVERNMENT FURNISHED SITE SECURITY MONITORING

A.  The Government shall provide one (1) Cleared American Guard and one (1) Construction Surveillance Technician for the duration of the construction activities. The Government staff will be responsible for reviewing the scheduled construction activities and coordinating site security monitoring with contractor and contractor security staff.  The normal working hours for US Government CAG and CST will be available 6 days per week, 10 hours per day, from Monday through Saturday.

3.4 CONTRACTOR FURNISHED SITE SECURITY MONITORING SERVICE

A.  The contractor is responsible for hiring a security monitoring subcontractor to provide Site Security Monitoring Services (SSMS).  The Site Security Monitoring Service (SSMS) Subcontractor shall furnish all personnel, tools, protective equipment and supplies to provide SSMS in accordance with rules, laws, regulations and security requirements as stated in the RFP documents. The contractor is responsible to ensure that SSMS is provided in accordance with (IAW) the Intelligence Community Standard (ICS) Number 705.l.[3]  The primary responsibility of the contractor is to provide Site Security Monitoring Personnel (SSMP) to detect unauthorized access to controlled areas, to deter construction worker activities, preventing the implantation of clandestine surveillance devices or systems into structures being constructed or its immediate surroundings.  The SSMP at a minimum shall include:  CSTs, CAGs, ~~LNGs~~[4] and Escorts. As stated in other Division I sections of the RFP documents, the controlled areas include Construction Site, SSA, and SCIF.  The contractor is responsible to ensure sufficient CST coverage is maintained in accordance with Attachment A, Labor Security Synchronization Matrix. Control to the site is conducted by Cleared American Guards ~~and Local Nationals Guards~~ through the Access

---

[3] The correct nomenclature for this document is 705-1, which we reference herein (62029 R4, tab 18 at 186).

[4] Solicitation Amendment No. 0003 revised paragraph 3.4, deleting the requirements of providing Local National Guards (LNG), and requiring a computerized inventory system (61176 R4, tab 7 at 87).

Control Facility (ACF). The ACF requires monitoring by the SSMP; 24 hours per day, 7-days a week. The SSMP shall assist the US Government Security staff with random selection of materials required for SCIF construction as well as other areas deemed necessary by the USG.

(61176 R4, tab 3 at 117-18, tab 6 at 23-24) (strikethrough text in the original)

5. Intelligence Community Standard Number 705-1 (ICS 705-1), referenced in Specification Section 01 31 00, paragraph 3.4 above, states, in part:

This Intelligence Community Standard sets forth the physical and technical security standards that apply to all sensitive compartmented information facilities (SCIF), including existing and new construction, and renovation of SCIFs for reciprocal use by all Intelligence Community (IC) elements and to enable information sharing to the greatest extent possible.

(62029 R4, tab 18 at 186)

6. ICS 705-1 states also:

For each SCIF construction project, a Construction Security Plan (CSP) shall be developed to address the application of security to the SCIF planning, design, and construction efforts. The specific format and content of the CSP may be developed by the [Accrediting Official] AO based upon the extent of the SCIF construction and security concerns related to the SCIF.

(62029 R4, tab 18 at 62, 188)

7. ICS 705-1 likewise provides:

Construction and design of SCIFs shall be performed by U.S. companies using U.S. persons (an individual who has been lawfully admitted for permanent residence as defined

5

in 8 U.S.C. 1101(a)(20) or who is a protected individual as defined by 8 U.S.C. 1324b(a)(3)).

(62029 R4, tab 18 at 188)

8. With regard to the roles and responsibilities of the SSMP, Amendment No. 0002 provides:

> 3.5.1 Construction Surveillance Technicians (CSTs).
>
> 3.5.1.1 The CSTs shall monitor, observe, and interact with the construction workers as they accomplish their various tasks to preclude the introduction of electronic, electrical, mechanical, or hostile surveillance monitoring devices into finished construction.
>
> 3.5.1.2 The CSTs shall be responsible for screening all equipment, materials, and furnishings destined for use in the controlled construction area using X-ray machine or other methods of examining deemed appropriate by the government such as visual, hand held wand, and other surveillance equipment.
>
>      . . . .
>
> 3.5.1.7 CSTs will assist local national construction contractor with the random purchases of non-inspectable equipment and material items on an as required basis. Assistance will include visiting local suppliers to ensure equipment and material items are suitable for construction and also implementing a random procurement selection process.
>
> 3.5.2 Cleared America Guards (CAGs)
>
> 3.5.2.1 The CAGs must be U.S. Citizens and possess a U.S. Secret clearance.

6

3.5.2.2 The CAGS will ~~supervise and augment the Local National Guard force to~~[5] perform access control functions at all vehicle and pedestrian entrances to the site on a 24/7 basis throughout the construction period. These activities include:

• Screening all non-cleared workers, vehicles, and equipment entering or exiting the site.

• Denying introduction of prohibited materials such as explosives, weapons, electronic devices, or other items as specified by the Accrediting Official (AO) or designee.

• Conducting random inspections of site areas to ensure no prohibited materials have been brought on to site. All suspicious materials or incidents shall be brought to the attention of the SSM or CST.

• Supervising non-cleared or non-US Guards.

3.5.2.3 The CAGs shall establish, maintain, and operate a Secure Storage Area (SSA) on the site or at an approved location outside the construction site boundary that will store construction materials and equipment that will be used in the SCIF in accordance with paragraph 4.G of IC Tech Spec for ICD/ICS 705.

. . . .

3.5.4.2 The Escorts will assist the CSTs to monitor, observe and interact with the construction workers as they accomplish various tasks to prevent the introduction of electronic, electrical, mechanical, or hostile surveillance monitoring devices into finished construction work performed by the construction contractor.

(61176 R4, tab 3 at 118-20, tab 6 at 24-26) (strikethrough in original)

---

[5] Solicitation Amendment No. 0003 revised paragraph 3.5.2.2, deleting the requirement that CAGs "supervise and augment the Local National Guard Force" (61176 R4, tab 7 at 88).

9. In a memorandum dated March 14, 2018, John Fern, Program Manager for ECCI, discussed Amendment No. 0002, stating, in part:

> Amendment 0002, dated 22 February 2012 added the requirement for construction contractors to provide SSMS to ensure the CAA would achieve accreditation. This is atypical in that SSMS are usually provided by the US Government for similar secure construction contracts, to provide the US Government the control and flexibility required to implement these services. As part of this Amendment, USACE added the provisions for the US Government to provide a CST and CAG, and for the Construction Contractor to provide the balance of CSTs, CAGs, and escorts required to provide adequate SSMS for the project. Following receipt of Amendment No. 0002, ECCI confirmed that our Cleared American Subcontractor, CACI Integrated Security Solutions (CACI-ISS), who was also providing low voltage electrical and telecommunications support to the team was qualified to meet the requirements and provide the necessary SSMS personnel to support the 501st MI BDE HQ Contract.

(62029 R4, tab 51 at 2)

*Solicitation Amendment No. 0003*

10. On March 7, 2012, the government issued Solicitation Amendment No. 0003, adding Specification 010041, "CONSTRUCTION SECURITY" (61176 R4, tab 7 at 16). Paragraph 1.01, "SUMMARY," states, in part, "[t]his section and its attachments provide explanation to the contractor to carry out construction requirements in accordance with Director National Intelligence Community Directive 705.1 (ICD 705.1) 'Physical and Technical Security Standards for Sensitive Compartmented Information Facilities (SCIF), September 17, 2010'" (61176 R4, tab 7 at 17; 62029 R4, tab 18 at 186-94).[6] The government issued "Technical Specifications for Construction and Management of Sensitive Compartmented Information Facilities,

---

[6] The reference in Specification No. 010041 to the document entitled "Director National Intelligence Community Directive 705.1 (ICD 705.1) 'Physical and Technical Security Standards for Sensitive Compartmented Information Facilities (SCIF), September 17, 2010'" (61176 R4, tab 7 at 17), appears to be a reference to "Intelligence Community Standard Number 705-1, 'Physical and Technical Security Standards for Sensitive Compartmented Information Facilities (SCIF), September 17, 2010'" (62029 R4, tab 18 at 186-94).

Version 1.2," which "sets forth the physical and technical security specifications and best practices for meeting standards of Intelligence Community Standard (ICS) 705-1" (62029 R4, tab 18 at 195, 200). Chapter 4, "SCIFs Outside the U.S. and NOT Under Chief of Mission (COM) Authority," includes paragraph D, "Construction Security Requirements" (62029 R4, tab 18 at 219, 223). Paragraph D.7, "Citizenship and Cleared Requirements for SCIF Construction Personnel," subparagraph (m), states that the site security manager (SSM) "may require cleared escorts or CSTs for non-cleared workers performing work exterior to the SCIF that may affect SCIF security" (62029 R4, tab 18 at 225).

11. Specification No. 010041, paragraph 1.01, also provides, "[t]hroughout the execution of this contract, the contractor and subcontractors shall collaborate and coordinate security requirements with the SSM, and COR [contracting officer's representative] to ensure the HQ facility is constructed in a manner to prevent technical compromise" (61176 R4, tab 3 at 21, tab 7 at 17).

12. Specification No. 010041, paragraph 1.04, "PERFORMANCE REQUIREMENTS," provides, in part:

> A. Comply with Government's requirements for participating in the project security procedures as specified in this and subsequent contract sections, Office of National Intelligence (ODNI) Policy Guidance (Approved Version at time of issuance of this contract) and the National Industrial Security Program Operating Manual (NISPOM) as requested subsequent to issuance of the Notice To Proceed (NTP). Afford unrestricted access to work, allow surveillance and inspection by any Government personnel as authorized by the SSM. Perform required security work when directed by the COR or SSM. Maintain security, and avoid compromise of classified information and materials caused by unauthorized disclosures and access to the work and its associated documentation.

(61176 R4, tab 3 at 22, tab 7 at 18)

13. Attachment D to Specification No. 010041 is a "Labor Security Synchronization Matrix" (Labor Matrix), detailing the CST/laborer ratio for various aspects of the construction. The ratios range from one CST per five laborers ("1:5") to

9

a maximum coverage of one CST to ten laborers ("1:10"). (61176 R4, tab 3 at 45-48, tab 7 at 41-44)[7]

*Additional Specification Requirements*

14.  Specification Section 01 22 00, "PAYMENT," provides, in part:

> 1.1 PAYMENT ITEMS
>
> Payment items for the work of this contract will be made [sic] are listed in the PROPOSAL SCHEDULE and described below.  All costs for items of work, which are not specifically mentioned to be included in a particular lump sum or unit price payment item, shall be included in the listed item most closely associated with the work involved.  The price and payment made for each item listed shall constitute full compensation for furnishing all plant, labor, materials, and equipment, and performing any associated Contractor quality control, environmental protection, meeting safety requirements, tests and reports, and for performing all work required for which separate payment is not otherwise provided.

(61176 R4, tab 3 at 111)

15.  Specification Section 01 31 00, "CONSTRUCTION EXECUTION AND COORDINATION," provides, in part:

> 1.5 ON-SITE STAFF REQUIREMENTS
>
> A. The Contractor shall provide an adequate professional administrative and supervisory staff on site in all aspects of work.  The key staff shall be fully coordinated and provide a professional level of project execution management.  The supervisory staff at a minimum shall include the following: Project Manager, Superintendent, Security Manager, QC Manager, and Safety Health Manager.  The contractor shall submit a Project Organization Chart that includes the following information:

---

[7] This same Labor Matrix is included in Specification Section 01 31 00, "CONSTRUCTION EXECUTION AND COORDINATION," as Attachment A (61176 R4, tab 3 at 124-27).

1. Depict principal staff assignments and contact information on a project organization chart.  Include key administrative and supervisory staff.

2. Provide resumes of staff.

3. Depict how management, supervisory, and administrative functions will be performed.  Where applicable, indicate where multiple tasks will be performed by the same individual.

(61176 R4, tab 3 at 115)

*Solicitation Questions and Answers*

16.  By letter dated March 26, 2012, Michael Miyagi, Contracting Officer, USACE, FED, provided all prospective offerors a copy of questions submitted on the Solicitation and the government's answers (61176 R4, tabs 17-18).

17.  Question and answer no. 18 provides:

[Question]  Specification 010041 Attachment C and Attachment "D" states that the CSTs are Government Employees Security and Site Personnel, it states CSTs will be provided by the US Government [USG] and will observe work at the Project site performed by uncleared contractor personnel in SCIF, and other areas as directed by the SSM and that the CST will have a minimum security level.  How many CSTs will the Government provide and have on-site?

[Answer]  In accordance with Section 01 31 00, per amendment 2, the Government will provide 1 CAG and CST. The contractor is to provide additional CAGs and CSTs to meet the requirements of Site Security Monitoring Services (SSMS).

(61176 R4, tab 17 at 7)

11

18. Question and answer no. 35.b provides:

> [Question] As this project involves SCIF and Temporary Security Facility, are these still considered "classified areas"?
>
> [Answer] It states that within the SCIF area construction is to be performed by "US Cleared" Labor as shown on the Labor Synchronization Matrix. The SCIF is a Classified Area and the Temporary Security Facility is not a Classified Area. The contractor is to follow the Labor Synchronization Matrix for Brigade HQ SCIF Area work and Non-SCIF Brigade HQ construction work.

(61176 R4, tab 17 at 12)

19. Question and answer no. 40.c provides:

> [Question] We understand that CSTE conduit, cable, equipment installation and termination, and the maintenance must be performed by a U.S. Secret Cleared Contractor. Please advise if – under the supervision of the CST – ROK labor or ROK subcontractors are allowed to perform other works for temporary security facilities, such as chain link fence for the SSA and project site perimeter and Site Security Manager Office.
>
> [Answer] Please follow Specification Section 010052 for temporary security requirements. This work in general does not require CST oversight as stated in the Division 1 Construction Security Specifications. Please follow the Labor Synchronization Matrix as it shows ROK Labor and US Cleared Labor responsibilities. The laborers must be vetted IAW the DD FM 254 and Division 1 Construction Security Specifications.

(61176 R4, tab 17 at 14)[8]

---

[8] "Division 1" is a reference to specifications starting with "01" (61176 R4, tab 1 at 34).

*ECCI's Technical Proposal*

20.  On March 29, 2012, appellant submitted its "Step Two" technical and price proposals (61176 R4, tabs 19-20).  In its cover letter, ECCI states, in part:

> Led by ECC, a US Prime Contractor with more than 26 years of experience managing and executing in excess of $3.2 Billion in US Federal Government construction, the ECC Team brings a wealth of global expertise to this project.  ECC has worked in Korea since 1999, developing strong relationships with local subcontractors and suppliers.  For this project, we have teamed with two Korean construction firms, Daelim and Krima, experienced with building DOD facilities in Korea.  We have also teamed with CACI, a secure constructor and operator of SCIFs in Korea for the US Army.  Our team is very familiar with the unique intelligence and operational requirements at USAG Humphreys, including secure and non-secure construction.  The ECC Team brings to USACE FED the expertise gained from Korea's most experienced construction companies and two leading secure facility construction providers.

(61176 R4, tab 20 at 1)

21.  ECCI identified CACI-ISS, Inc. (CACI) as its SSMS subcontractor for construction, stating, in part:

> CACI personnel are highly experienced with installing ESS [electronic Security System] systems and their accompanying infrastructure and Information systems (C4I) [command, control, communications, computers, and intelligence] in accordance with Intelligence Community Technical Specification (IC Tech Spec-for ICD/ICS 705) and Director of Central Intelligence Directives (DCID) 6/9 requirements and accreditation standards.
>
> For this project, CACI will be responsible for all special electrical fit-up as well as configuring, installing, and testing the Intrusion Detection System (IDS) and Access

Control System (ACS). CACI will also provide the Site Security Monitoring Services (SSMS) for all aspects of the construction.

(61176 R4, tab 19 at 8)

22. ECCI's technical proposal included a project "Organization Chart." The color-coded legend identifies the following organizational components: "ECC Personnel" (blue); "USACE FED Personnel" (red); "Subcontractors" (green), and "ECC and Team Subcontractor Personnel" (blue/green). The chart identifies three government positions in red: Site Security Manager (SSM) Michael Lessard; a CST; and a CAG. In a separate box, entitled "Site Security Monitoring Services," placed below the government positions, were Contractor Security Manager Paul Viall, CSTs, CAGs, and Cleared American Escorts (CAEs), all identified as blue/green for ECCI and Team Subcontractor Personnel. The line of reporting, as specified in the legend key, provided that Mr. Viall reported to Mr. Lessard and Corporate Security Manager Rick Davis. The chart did not specify anyone to whom Mr. Lessard reported (61176 R4, tab 19 at 9).

23. The Organization Chart identifies five individuals as "Key Personnel." In addition to Mr. Viall, ECCI designates the following as key: Project Manager Tom Maher, Project Superintendent Chris Miller, CQC [Contractor Quality Control] System Manager Freddie McClane, and Site Safety and Health Officer, Todd Savko. (61176 R4, tab 19 at 9) Although the chart identifies Mr. Viall as "ECC Personnel," the technical proposal states:

> This key personnel team will be supplemented by our Contractor Security Manager, Paul Viall, who is an employee of our teaming partner CACI. The remainder of the SSMS, including Construction Surveillance Technicians, Cleared American Guards, and Cleared American Escorts will also be provided by CACI.

(61176 R4, tab 19 at 10)

24. The technical proposal includes a chart entitled "Project Supervision and Communication Methods Executed in All Phases," which, as to Mr. Viall's role as Construction Security Manager (CSM), states, "Supervises: Cleared Technicians, Guards, and Escorts" and "Interacts with: FED site Security Mgr." Mr. Viall's responsibilities were identified as:

- Weekly status and schedule reviews
- Monitors daily work

14

- Weekly and status meetings with Government Site Security Mgr to update CSPs and security protocols
- Daily SSA, ACF, and SCIF access log reviews.

(61176 R4, tab 19 at 19)

25. With regard to Mr. Viall, the technical proposal also states:

> Paul Viall will serve as ECC's Contractor Security Manager and Point of Contact for all access issues at the project site. Mr. Viall will maintain a current list of personnel on site, track all badges, and immediately report any changes or lost badges to USAG Humphreys. This list will be updated and emailed or hand-carried weekly to USAG Humphreys, and if new personnel are added to the list, it will be updated prior to their entry onto the facility.
>
> Mr. Viall will work directly and closely with the US Government's Site Security Manager to ensure site security is not compromised in any way. He will assign Construction Surveillance Technicians, Cleared American Guards, and Cleared American Escorts to the project, and ensure security first and delivery of the project second.

(61176 R4, tab 19 at 23)

26. ECCI's technical proposal included no discussion of SSMS work that ECCI anticipated the government SSM, CST, and CAG, would perform on ECCI's behalf or how such work might be ordered by ECCI, or coordinated and scheduled with the government (61176 R4, tab 19). The only reference in the technical proposal to the government CST and CAG is their mention in ECCI's Organization Chart (61176 R4, tab 19 at 9). With regard to the government SSM, in addition to the chart, the technical proposal includes the following general statement:

> ECC will collaborate and coordinate security requirements with the US Government's Site Security Manager (SSM), and Contracting Officer's Representative (COR) to ensure the 501st MI BDE HQ Complex is constructed in a manner to prevent any technical compromise. The requirements involve interfacing with a number of security-related US

Government entities, always coordinated with the USACE
FED, Resident Engineer/COR and SSM.

(61176 R4, tab 19 at 14)

*ECCI's Price Proposal*

27.  ECCI proposed a total contract price of $35,467,113, which included a stated cost of $345,683, for SSMS, CLIN 0006 (61176 R4, tab 20 at 10-11). Appellant's price proposal also included a separate entry for SSMS labor of $3,518,880.26, and a firm fixed price breakdown of hours and costs for the positions of CAG, CST, CAE, and SSM (61176 R4, tab 20 at 12).  The excerpt of ECCI's original price proposal contained in the record evidences no discussion of the government CST or CAG, or how such government personnel might be utilized by ECCI in performing SSMS, nor does it indicate that ECCI reduced its SSMS price in reliance upon the government's statement that it would provide a CST or CAG pursuant to Specification Section 01 31 00, paragraph 3.3 (61176 R4, tab 20).

28.  In his declaration dated December 26, 2019, Mr. Fern states, in part:

> In reliance upon the terms of the RFP and the clarifying
> Q&A published by USACE, ECCI submitted its proposal
> in response to the RFP on March 29, 2012.  This proposal
> reflected my interpretation of the RFP that ECCI could and
> would use the Government CAG and CST to perform some
> of the site security monitoring services, and the bid cost for
> such work was thereby reduced accordingly.
>
> . . . .
>
> In its technical proposal, ECCI made it clear that its Site
> Security staffing plan required by the RFP intended to
> utilize the CAG and CST personnel provided by the
> Government as part of the on-site resources to review the
> scheduled construction activities, coordinate site security
> monitoring, and assist ECCI with Site Security Monitoring
> Services for the duration of the Contract.  This staffing
> plan was prepared consistent with my understanding of the
> RFP that the Government's CAG and CST were available
> to ECCI to assist in performing the SSMS work.

(App. supp. R4, tab 1 at 9-10)

16

29. In his March 14, 2018, memorandum, Mr. Fern states:

> While preparing ECCI's Technical and Price Proposal, I have a specific recollection of discussing with ECCI's bid team the Amendment 0002 specification requirements related to the US Government provided CST and CAG, and that those two individuals could and, given the language of the Request for Proposal, that these individuals would be available to support the project and therefore reduce the total amount of additional CSTs and CAGs that the ECCI team would have to include in our bid to meet the SSMS requirements of the Request for Proposal (RFP).

(62029 R4, tab 51 at 2)

30. Appellant states in its interrogatory response, under the signature of Mr. Fern:

> If the RFP states to all offerors that the Government will provide one CAG and one CST, and with the function of a CAG and CST being well known to experienced secure construction contractors, then a prudent bidder in a competitive situation would have no choice but to remove one CAG and one CST from their pricing.
>
>      . . . .
>
> Given the limited time period offerors were provided to prepare proposals, a trend log of detailed changes that were made prior to submission of our original bid were not documented for the record. However, ECCI also made significant adjustments to the SSMS costs between our original proposal submission and our revised proposal submission following discussions . . . .
>
>      . . . .
>
> Considering the significant reductions in the proposed CAG costs, and the uncertainty associated with the 501st project being the first secure project at USAG Humphreys the reductions in SSMS costs in ECCI's revised proposal more than accounted for the assumption that the

17

Government would be providing 1 CAG and 1 CST to support the SSMS for the 501st project.

(Gov't supp. R4, tab 11 at 2-5)

*Government Evaluation Board Recommendation*

31. On April 4, 2012, the Government's evaluation board recommended that ECCI be found Technically Acceptable based upon its March 29, 2012 "Step 2" Proposal (61176 R4, tab 21). By letter dated April 4, 2012, Mr. Miyagi informed ECCI:

> In reviewing your price proposal, I have noted that your unit price proposed for Contract Line Item (CLIN) 0006, Site Security Monitoring Service (SSMS) does not correspond to the supporting cost breakdown you provided for this CLIN. Your proposed price for CLIN 0006 is in the amount of $345,683.00 whereas the total costs in the supporting documentation amounts to $3,518,880.26 (see attached). Please verify whether your proposed price for CLIN 0006 of $345,683.00 is the price that you intended.
>
> It is important for you to understand that I am only seeking verification of your proposed price. You should not construe this letter as the opening of "discussions," or an opportunity to revise your price proposal. Your response to me should be limited to: 1) your statement that you find no errors in your proposed price, or 2) a statement that you have discovered an error. If you discovered an error, please advise me of the nature of the error and I will give you further guidance on how to proceed.

(61176 R4, tab 23) (emphasis in original)

32. By letter dated April 5, 2012, Mr. Fern responded to Mr. Miyagi's April 4, 2012, letter, stating, in part:

> In response to your letter dated April 4, 2012, we have evaluated our cost estimate as requested and have verified our price. Our estimate includes all of the costs required to construct the facility in accordance with the RFP. However, based on the RFP and amendments, we understood that only the management of the Site Security

18

Monitoring Services (SSMS) was to have been included under CLIN 0006. The remaining costs that we included in the detailed backup was included under the specific CLIN the surveillance was related to (i.e., primarily CLINs 0001 and 0005). We would be happy to make any necessary changes to the bid form if this is required.

(61176 R4, tab 24)

33. By letter dated April 6, 2012, Mr. Miyagi informed ECCI that its proposal placed it within the competitive range and requested ECCI address the following comments:

b. Section 00100 of the solicitation, Provision F52.4203, Proposal Data Required, paragraph j., Site Security Personnel. You have not provided a cost breakdown by months to correspond with your proposed project schedule as required in this section of the solicitation. Your cost breakdown shall include man hours and labor costs including wages, labor burden, subsistence, lodging and other labor related costs.

c. Section 01 22 00, Payment, paragraph 1.5, Item 0006, Site security Monitoring Service. All costs associated with the site security monitoring service as identified in this section, should be included in CLIN 0006, Site Security Monitoring Service. You have stated in your letter dated April 5, 2012, Subject: Step 2 -Technical and Price Proposals for FY08 MCA PN 8784, Brigade Headquarters Complex, USAG Humphreys, Korea that some costs associated with the Site Security Monitoring Service are included in other CLINs, specifically, CLINs 0001 and 0005. Please make the necessary revision to have all costs associated with the Site Security Monitoring Service be included in CLIN 0006 in the Price Schedule.

(61176 R4, tab 26 at 1-2)

19

34. By letter dated April 9, 2012, ECCI submitted its revised price proposal. In the cover letter, Mr. Fern responded to Mr. Miyagi's April 6, 2012, letter, stating, in part:

> 2. Section 00100 of the solicitation, Provision F52.4203, Proposal Data Required, paragraph j., Site Security Personnel. Attached is a SSMS cost breakdown by months (in PDF) to correspond with our proposed Factor 5 - Project Schedule included our Technical Proposal. We have also provided the monthly SSMS hours and costs in graphical format as well as our Project Schedule annotated with call-outs of the site security personnel requirements for easy review. In addition, we have included the SSMS cost breakdown by days to provide further details of our estimate.
>
> 3. Section 01 22 00, Payment, paragraph 1.4, Item 0006, Site Security monitoring Service. We have ensured that all costs associated with the site security monitoring service as identified in this section have been included in CLIN 0006, Site Security Monitoring Service. Attached is our revised Proposal Schedule (in PDF) for your review.

(61176 R4, tab 27 at 1)

35. ECCI's revised price proposal includes a lump sum price of $3,320,056, for CLIN 0006, and a decrease of its total proposed price from $35,467,113, to $32,468,604 (61176 R4, tab 20 at 10, tab 27 at 8). ECCI provided the following breakdown for CLIN 0006: CAG, 29,880 hours at $66.75 per hour for a total of $1,994,530.00; CST, 8,210 hours at $77.19 per hour, for a total of $633,710.00; CAE, 5,050 hours at $66.75 per hour, for a total of $337,094.00; and Security Manager, 4,040 hours at $87.80 per hour for a total of $354,722.00 (61176 R4, tab 27 at 11).[9]

36. ECCI's revised price proposal includes a document entitled "Project Schedule in Support of the SSMS Cost Estimate (CLIN 0006)" (61176 R4, tab 27

---

[9] We note that for each CLIN item, multiplying the stated hourly rate by the stated number of hours renders marginally different total amounts for each, i.e.: CAG - $1,994,490.00, not $1,994,530.00; CST - $633,729.90, not $633,710.00; CAE - $337,087.50, not $337,094.00; and Security Manager - $354,712.00, not $354,722.00.

at 15). With regard to CSTs and CAGs, for the period of May 2013, the construction schedule states, in part:

> CSTs and CAEs will mobilize to support initial site construction. CSTs and CAEs will be adjusted to cover work at the site in accordance with RFP.
>
> . . . .
>
> After temporary structures (ACF/SSA) are completed, 2 CAGs will be stationed in the ACF Building and 2 CAGs at the vehicle access gate during operating hours. During non-operating hours, 1 CAG will be stationed in the ACF full time per the RFP.

(61176 R4, tab 27 at 17)

37. Appellant's revised price proposal included no discussion of the government CST or CAG, or how such government personnel might be utilized by ECCI in performing SSMS, nor does it indicate that ECCI reduced its SSMS price in reliance upon the government's statement that it would provide a CST or CAG pursuant to Specification Section 01 31 00, paragraph 3.3 (61176 R4, tab 27).

38. When asked during discovery to identify documents that support ECCI's claim that it "reduced the quantity of CAG's and CST's by one each in its pricing," Mr. Fern, responded that "a trend log of detailed changes that were made prior to submission of our original bid were not documented for the record" (gov't supp. R4, tab 11 at 4; finding 30).

39. When asked during discovery to identify documents that support the statement in ECCI's August 14, 2014, letter that in its *revised* price proposal (as opposed to the original price proposal discussed in the paragraph above) "ECCI reduced the quantity of CAG's and CST's by one each in its pricing," Mr. Fern responded that there was an "overall reduction of $704k from ECCI's original to revised SSMS price," and that "the reductions in SSMS costs in ECCI's revised proposal more than accounted for the assumption that the Government would be providing 1 CAG and 1 CST to support the SSMS for the 501st project" (gov't supp. R4, tab 11 at 3-5, finding 30). If ECCI's original price proposal included a reduction in price based upon the belief that the solicitation promised the government would provide one CAG and CST who would be available to perform contractor work, there would be no need for a further decrease in its revised price proposal based upon this same assumption.

21

40. The reason the government included in the RFP the requirement that SSMS be performed by a subcontractor to the prime is reflected in correspondence between the National Security Agency (NSA) and USACE FED. By email dated February 14, 2012, Timothy Besse, NSA Technical Support Program Management Office, informed Mr. Lessard:

> CST & CAG Concurrence
>
> ADS&CI [Associate Director for Security and Counterintelligence] /Field Security (Q14) acknowledges that a fixed cost for all aspects of Project 58784 must be [submitted] to DoD in March 2012 if this project is to survive. Q14 recognizes that IDIQ contracts for security surveillance cannot be in place by this March deadline. Consequently, Q14 Branch Chief Joe Hebda concurs in principle with your plan to include these security services into the construction general contractor's (GC) fixed price contract. Q14's concurrence is based upon the following:
>
> The GC will provide via a subcontractor CST and CAG services to this project, either as a single subcontract for both disciplines, or a separate subcontract for each discipline. You, the SSM, will be the contracting officer representative for the CAG & CST contract(s). You will also have a USACE staff CST, and USACE staff CAG at your disposal who will monitor the contract CAGs for contract adherence.

(61176 R4, tab 35 at 3-4)

41. By email dated February 16, 2012, Mr. Miyagi informed Mr. Lessard that "NSA concurred in principle with our plan for incorporation into the construction contract subject to the condition that the Government provides one CST and one CAG" (61176 R4, tab 35 at 1).

42. By memorandum dated August 31, 2012, Richard S. Weaver, Chief, Office of Physical Security and Antiterrorism/Force Protection, NSA, Central Security Service, informed COL Donald E. Degidio, Jr., USACE, FED, that although NSA did not concur with the strategy of utilizing a subcontractor to the prime as the security contractor, "in the spirit of cooperation we are willing to work with you to ensure compliance with our Security mandates and that projects can move forward." NSA

22

granted "a one-time exception to our approach outlined above for the construction of the 501st MI Brigade Headquarters and allow for the security contractor to be subcontracted to the prime construction contract . . . ." (61176 R4, tab 36 at 1).

43. Briefing slides dated March 25, 2013, prepared to obtain a decision from the FED Commander on a course of action for the role of Site Security Management, discuss the government CAG and CST (gov't supp. R4, tab 34b at 1-2). In his declaration, Administrative Contracting Officer Sang-Sung (Steve) Kim states that the slide presentation discussed "three options . . . designed to provide different ways of providing the Government management of site security monitoring and oversight of the Project" and that the government CST and CAG positions mentioned therein "were part of the Government management and oversight of the project and were not stated or intended to be part of the contractor's labor crew or otherwise for the use of the contractor" (gov't supp. R4, tab 34a at 2-3).

*Contract Award*

44. On September 17, 2012, the government awarded ECCI Contract No. W912UM-12-C-0058 (the Contract), with a total price of $32,468,604, and a price of $3,320,056, for CLIN 0006 (61176 R4, tab 2 at 3-5). The Notice to Proceed letter issued that same day (61176 R4, tab 29) established an original Contract Completion Date (CCD) of September 7, 2014 (September 17, 2012, plus 720 days) (61176 R4, tab 2 at 168, tab 7 at 12).

45. The Contract incorporates by full text FAR 52.243-4, CHANGES (JUN 2007), which provides, in part

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice . . . .
>
>       . . . .
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any

23

change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. . . .

. . . .

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal, unless this period is extended by the Government.  The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

(61176 R4, tab 2 at 108-09)

46.  The Contract incorporates by full text FAR 52.246-12, INSPECTION OF CONSTRUCTION (AUG 1996), which provides, in part:

(c) Government inspections and tests are for the sole benefit of the Government . . . .

. . . .

(d) The presence or absence of a Government inspector does not relieve the Contractor from any contract requirement, nor is the inspector authorized to change any term or condition of the specification without the Contracting Officer's written authorization.

(61176 R4, tab 2 at 120-21)

47.  The Contract incorporates by full text FAR 52.245-1, GOVERNMENT PROPERTY (AUG 2010) ALTERNATE I (AUG 2010), which defines government-furnished property and government property as follows:

Government-furnished property includes, but is not limited to, spares and property furnished for repair, maintenance, overhaul, or modification.  Government-furnished property also includes contractor-acquired property if the contractor-acquired property is a deliverable under a cost

24

contract when accepted by the Government for continued use under the contract.

Government property means all property owned or leased by the Government. Government property includes both Government-furnished and Contractor-acquired property. Government property includes material, equipment, special tooling, special test equipment, and real property. Government property does not include intellectual property and software.

(61176 R4, tab 2 at 110-11)

48. The Contract also provides:

Only a warranted Contracting Officer (either a Procuring Contracting Officer (PCO), or an Administrative Contracting Officer (ACO)), acting within their delegated limits, has the authority to issue modifications or otherwise change the terms and conditions of this contract. If an individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract you shall not proceed with the change and shall immediately notify the Contracting Officer.

(61176 R4, tab 2 at 4)

49. In November 2012, ECCI entered into a Fixed Unit Price subcontract with CACI in the amount of $4,255,424, which included $2,808,588, for performing SSMS (gov't supp. R4, tab 16 at 1). The Statement of Work provides, in part:

CACI-ISS will provide all on-site security services as directed by the US Government Site Security Manager including:

1. Provide Cleared American Guards (CAGs), Construction Surveillance Technicians (CSTs), and Cleared American Escorts (CAEs), all with the proper security clearance as defined by DCID 6/9 and ICD 705 for DOD overseas SCIF construction and the project specifications.

2. Provide security oversight of all aspects of SCIF construction as identified in ICS 705-1[.]

3. On a monthly look ahead basis, CACI-ISS will coordinate with the Project Superintendent to ensure the proper security staffing level is maintained that meets the surveillance ratio as required by the US Governments Performance Metrics.

4. CACI-ISS will staff the SSMS sufficiently to ensure the project schedule is not impacted.

(Gov't supp. R4, tab 16 at 128) The subcontract contained no discussion of the government CAG or CST, or how such government personnel might be utilized by CACI in performing SSMS (gov't supp. R4, tab 16).

*Construction Security Monitoring Plan*

50. ECCI issued the project's Construction Security Monitoring Plan (CSMP), dated February 19, 2013 (gov't supp. R4, tab 22 at 2-3). The CSMP covered several subjects, including the Site Security Monitoring Service Standard Operating Procedure (SSMS SOP) (gov't supp. R4, tab 22 at 5, 7). Section 2 of the CSMP, entitled "Personnel," includes information regarding the Parent Agency, USACE FED, the Contracting Officer, the COR, the Government SSM, the CSM), CSTs, and CAGs (gov't supp. R4, tab 22 at 9-11).

51. With regard to USACE FED, the CSMP provides that the "Parent Agency is responsible for promulgating construction surveillance, construction material, and transit security standards" for the project, monitoring compliance with the CSP and SOP during the life of the project. It also provides that the government's SSM "shall have the authority to stop the construction project in the event of a serious security incident," is responsible for the oversight of security incidents, infractions, or violations," and that the contractor CSM shall notify the SSM "in the event of any of these situations occurring." (Gov't supp. R4, tab 22 at 9-10)

52. The CSMP states that the government "SSM serves as the Security Project Manager for FED, is the primary point of contact for compliance and coordination of security measures, and accreditation, and is responsible for implementation of the CSP and SSP. The CSMP also provides that "the CSM, CAG, CST, and CAE assist the SSM by providing access control intrusion deletion, and, transit security oversight" and "[t]he SSM has the authority and responsibility to stop work should security issues" so require. (Gov't supp. R4, tab 22 at 10)

53.  The CSMP states that the CSM is a senior security representative who assists the SSM in CSP compliance, "inspecting perimeter security and access control," and, in the absence of the SSM, may be directed "to act in his/her behalf and assume the authority for the management of the CSP."  It likewise provides that the "Labor security synchronization matrix will be utilized as a basis to deploy proper manning of SSMS personnel - specifically, the CAGs, CAEs, and CSTs."  (Gov't supp. R4, tab 22 at 10)

54.  The CSMP states that CSTs will be provided "by Team ECCI and will observe work performed by contractor personnel at 501st BDG HQ Site and the immediate Construction Site for that specific building and insect [sic] all materials destined for the constructor site."  The CSMP notes that because "the majority of contractor personnel will not have security clearances," there will be an increase in "the need for CST deployment" and "[t]he rationale for CST deployment is based upon [the] size (square footage) of the [project] and the type and location of work being performed."  According to the CSMP, the "CAGs will control admittance to and departures from the" project construction site.  (Gov't supp. R4, tab 22 at 10-11)  The CSMP includes no discussion of the one government CAG and CST, or how such government personnel might be utilized by ECCI in performing SSMS (gov't supp. R4, tab 22).

*Site Security Plan*

55.  By email dated May 1, 2013, Mr. Jones provided to Mr. Lessard a copy of CACI's Site Security Plan (SSP) (gov't supp. R4, tab 21 at 1).  Section 1.3 of the SSP, "Responsibility," provides, in part:

> (d) CACI PROVIDED SITE SECURITY SERVICES
>
> CACI and all sub-contractors under the contract for providing Site Security Services (SSS), will ensure Site Security Personnel (SSP), Project Director, and the construction contractors, adhere to, and abide by, the Construction Security Plan (CSP) as developed by the Site Security Manager and in compliance with the terms of the contract[.]
>
> . . . .
>
> (f) CONTRACTOR SECURITY MANAGER (CSM)
>
> The CSM is the senior security representative for the performance of the security contract as outlined in the

27

performance standards. The CSM assists the SSM in the compliance of the CSP. The CSM has operational responsibilities for the coordination of deliveries, screening, and storage of materials for the sensitive construction areas as well as normal and unique procedural security issues. The CSM is responsible for the daily tracking and recording of the daily events and chronological log records and reporting any deficiencies or items of interest to the SSM. The CSM will also aid the SSM with inspecting perimeter security and access control of the construction area, and the access control program. In the absence of the SSM, the CSM may be directed by the SSM to act in his/her behalf and assume the authority for the management of the CSP.

(Gov't supp. R4, tab 21 at 6)

56. Section 2.3 of the SSP, "CONSTRUCTION SURVEILLANCE PERSONNEL SITE SECURITY MANAGER (SSM)," provides, in part:

(a) CONTRACTOR SECURITY MANAGER (CSM)

The CSM assists the SSM in the management and compliance with the CSP. The CSM coordinates the daily CAG/CST operations and ensures the SSM is given all information to support reporting requirements.

(b) CONSTRUCTION SURVEILLANCE TECHNICIANS (CSTs)

The CST will be provided by CACI, Inc. and will observe work performed by contractor personnel at 50lst MI BDE HQ Site and the immediate Construction Site for that specific building and inspect all materials destined for the construction site. The fact that the majority of contractor personnel will not have security clearances will greatly increase the need for CST deployment. CST coverage will start at the commencement of the building projects general construction and end surveillance coverage upon determination by the SSM. The rationale for CST deployment is based upon size (square footage) of the project and the type and location of work being performed.

The SSM will maintain appropriate CST deployment
during general construction of the building project effort.

(Gov't supp. R4, tab 21 at 9)  The SSP includes no discussion of the one government CAG or CST, or how such government personnel might be utilized by CACI in performing SSMS (gov't supp. R4, tab 21).

*Contract Modifications*

57.  Over the course of Contract performance, the parties entered into several modifications increasing the price paid by the government to ECCI pursuant to CLIN 0006 for SSMS (61176 R4, tab 32 at 3).  On December 12, 2013, the government issued unilateral Modification No. P00002, increasing CLIN 0006 by a lump sum of $45,500, as part of a Unilateral Notice to Proceed, Unpriced Change Order, to modify the project's generator sets (61176 R4, tab 13).

58.  On July 14, 2014, the parties entered into bilateral Modification No. P00004, extending the Contract by 250 calendar days, including 200 days of compensable delay and 50 days of non-compensable delay.  The modification included $1,368,304.47, for costs associated with CLIN 0006 for the 200 days of compensable delay.  (61176 R4, tab 14 at 3; 62029 R4, tab 34 at 23-24, tab 49 at 2)  Modification No. P00004 includes the following Closing Statement:

> This modification formally incorporates into the contract the changes contained in, and completes action required by Modification No. P00002, issued by the Contracting Officer on 12 December 2013, and Modification No. A00004, issued by the Administrative Contracting Officer on 19 February 2014.
>
> It is further understood and agreed by all parties that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all cost and markups attributable to the circumstances giving rise to this modification for all delays related thereto, and for performance of the change within the timeframe stated.
>
> All other terms and conditions of the contract remain the same.

(61176 R4, tab 14 at 3)

29

59. On September 5, 2014, the parties entered into bilateral Modification No. P00005 to downsize UPS banks, which included $96,101.00, for SSMS costs, bringing the total under CLIN 0006 to $4,829,961.47 (61176 R4, tab 15, tab 32 at 3). Modification No. P00005 includes the following Closing Statement:

> This modification formally incorporates into the contract the changes contained in and completes the action required by the unpriced Notice to Proceed, Modification No. P00003 (NTP), issued by the Contracting Officer, dated 14 January 2014, and receipt of which was acknowledged by the Contractor on the same date.
>
> It is further understood and agreed by all parties that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all cost and markups attributable to the circumstances giving rise to this modification for all delays related thereto, and for performance of the change within the timeframe stated.
>
> All other terms and conditions of the contract remain the same.

(61176 R4, tab 15 at 3)

60. On April 14, 2016, the parties entered into bilateral Modification No. P00008, implementing changes to the facility's doors and adding painting of the CAA perimeter above the false ceiling. The modification extended the Contract 441 calendar days, of which 71 days were compensable and 370 were excused but non-compensable delay, i.e., the government waived the assessment of liquidated damages for these 370 days. The modification included $302,323, for costs associated with CLIN 0006 for the 71 days of compensable delay. (62029 R4, tab 16 at 2-3, tab 37 at 2) Modification No. P00008 includes the following Closing Statement addressing the adjustment of CCD and the final resolution of time issues contingent upon a Completion Schedule to the CCD of August 23, 2016, as follows:

> It is further understood and agreed by all parties that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all cost and markups attributable to the circumstances giving rise to this modification for all delays related thereto, and for the performance of the change within the time frame stated.

The Contractor accepts this modification as full and final settlement for any and all time related issues from the date of contract award to the date of this modification. In return the Contractor shall submit a new baseline Completion Schedule from the date of award of this modification through the revised Contract Completion Date of 23 August 2016. The new construction schedule shall be subject to the Government approval. The contractor will be relieved of the obligation to update or correct prior construction schedule submittals under this agreement. The new baseline Completion Schedule will be the basis for measuring satisfactory progress on the project up to the new CCD.

All other terms and conditions of the contract remain the same.

(62029 R4, tab 16 at 3)

61. On April 14, 2016, the parties entered into bilateral Modification No. A00020, adding air grills and perforated floor panels. The modification increased CLIN 0006 by $7,496, for an additional CST (in addition to CST proposed for SSMS under the concurrent Modification No. P00008) to monitor the work that will be performed in "areas contiguous to the CAA." (62029 R4, tab 17 at 1-3)

62. Modification No. A0020 contains the following Closing Statement:

It is further understood and agreed by all parties that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all cost and markups attributable to the circumstances giving rise to this modification for all delays related thereto, and for performance of the changes within the time frame stated.

(62029 R4, tab 17 at 3-4)

*Claim Submission in Appeal No. 61176*

63. By letter dated August 6, 2014, to Mr. Kim, ECCI, submitted a price proposal in the amount of $855,584, seeking compensation pursuant to the Changes Clause (FAR 52.243-4), based upon the government's failure to provide one CAG and

CST, which ECCI believed would be available to perform contractor work (61176 R4, tab 33).

64. On August 7, 2014, Mr. Kim responded to ECCI's August 6th letter, stating:

> The Government does not disagree with your statement that contract specification section 01 31 00, Paragraph 3.3.A state[s] the Government will furnish one (1) Cleared American Guard and one (1) Construction Surveillance Technician. This paragraph also states the Government staff will be responsible for reviewing the scheduled construction activities and coordinating site security monitoring with the contractor security staff.
>
> The purpose of these two government personnel would have been solely for the benefit of the Government to review your construction activities and monitor your Site Security Monitoring Services (SSMS) subcontractor because of potential conflicts of interest. The requirement for the Government to have these two personnel on site was subsequently waived by the National Security Agency. It is the Government's position that the lack of these two personnel which were not for the benefit of the contactor did not result in any increased cost. Therefore your Request for Equitable Adjustment is denied.

(61176 R4, tab 34)

65. By letter dated August 14, 2014, to Mr. Kim, ECCI requested reconsideration of the Government's position, stating, in part:

> Bidders develop the number of CAGs and CSTs that are necessary to perform the secure work. If the Government states to all bidders that the Government will provide a CAG and a CST, and with the function of a CAG and CST being well known to experienced secure construction contractors, then a prudent bidder in a competitive situation has no choice but to remove one CAG and one CST from his pricing.
>
> . . . .

In a competitive bidding environment, any reasonable offeror experienced in secure construction, knowing what functions CAGs and CSTs perform, would reasonably construe the Government's statement to mean that the Government would provide (1) CAG and (1) CST, and that the Contractor (ECCI) would provide additional CAG's and CST's as needed to maintain the required ratio's specified in the labor synchronization matrix. Subsequently, ECCI reduced the quantity of CAG's and CST's by one each in its pricing.

(61176 R4, tab 37 at 1)

66. By letter dated October 8, 2014, Mr. Kim responded to ECCI's August 14th letter, stating, in part:

The Government does not concur with your position that the (1) Cleared American Guard (CAG) and (1) Construction Surveillance Technician (CST) were for the benefit of the of the [sic] contractor.

It is the Government's position that the (1) CAG and (1) CST were for the Government's benefit. Their purpose would have been to review the scheduled construction activities and coordinate site security monitoring with the contractor security staff.

It is the Government's view that not providing these two personnel (1-CAG and 1-CST), which were not for the benefit of the contractor, did not result in any increased cost to ECCI. Therefore your Request for Equitable Adjustment is denied.

(61176 R4, tab 38)

67. By letter dated May 7, 2015, ECCI submitted a Request for Equitable Adjustment (REA) No. 1 in the amount of $961,533, for costs allegedly incurred in providing additional CAG and CST coverage on the project (61176 R4, tab 39).

68. By letter dated June 22, 2016, ECCI submitted to Contracting Officer Lisa Billman a claim in the same amount as its May 7th REA, which included the requisite CDA certification (61176 R4, tab 16 at 1, 3). ECCI's calculated its REA and claim amount based upon the daily cost of one additional CAG and CST for every day

33

ECCI performed SSMS work on the Contract, from May 21, 2013, through June 9, 2015 (61176 R4, tab 16 at 31).

69. On February 21, 2017, Ms. Billman issued a final decision denying ECCI's certified claim (61176 R4, tab 1). The final decision acknowledged that the Contract specified the government would provide one CAG and one CST, that the government ultimately did not provide such personnel, and that this constituted a change to the Contract (61176 R4, tab 1 at 1-2, 28). The final decision quoted Mr. Lee's letter dated August 7, 2014, which (1) states that the purpose of providing the government personnel on the project was solely for the benefit of the government and (2) acknowledged that NSA had waived the requirement that the government provide a CAG and CST on the project. The final decision also referenced NSA's February 14, 2012 email (finding 40) and August 31, 2012 letter (finding 42), and acknowledged that neither document was "provided to offerors prior to award." (61176 R4, tab 1 at 21-22)

70. The final decision asserted that previously-executed bilateral modifications were an accord and satisfaction that settled ECCI's right to additional payment for the Government's alleged failure to furnish one CAG and CST (61176 R4, tab 1 at 47-48).

*Claim Submission in Appeal No. 62029*

71. By letter dated March 14, 2014, to Mr. Kim, ECCI provided a "Notification of Change" pursuant to FAR 52.243-4, raising the issue of SSM authority, and requesting clarification of the scope of CST monitoring in CAA contiguous space (62029 R4, tab 18 at 451). ECCI stated that standards set forth in "ICD 705.1" were "not being enforced on-site by the Government's Site Security Managers where CSTs are being used in a dual role as surveillance technicians and sentries" and that "ECCI considers this a changed condition to use CSTs to monitor work excess to the contract requirements and provides written notice there are cost impacts associated with this changed direction" (62029 R4, tab 18 at 451-52). ECCI requested a written clarification from the Contracting Officer March 18, 2014 (*id*. at 452).

72. By letter dated June 23, 2014, Mr. Kim responded to ECCI's March 14, 2014, letter, stating:

> • ECCI should continue to utilize the CSTs according to contract requirements for monitoring of the actual construction performed by un-cleared workers within the CAA and when work is being performed that penetrates the CAA perimeter wall

34

• CST should be utilized to monitor the CAA space as well as areas contiguous to the CAA space that penetrate the perimeter walls, windows, doors, ceiling and floor

• The site security manager does not have authorization to request changes to the contract requirements

(62029 R4, tab 18 at 453)

73. By email dated March 22, 2015, to CACI, Mr. Greg Joyce, ECCI Senior Program Manager, stated, in part:

> Even though we had a previous agreement from Govt. reps weeks ago, that CAGs and CSTs were not necessary to guard a thick reinforced concrete slab (on the 2nd floor, and not part of the SCIF that is on the first floor), issues still arose post agreement, and issues still arise. Debates still occurred post agreement, and still occur. I want to make it clear once and for all that neither a CAG nor a CST is required on the second floor above the SCIF unless we are drilling into said floor that is above the SCIF ("CAA space").
>
> . . . .
>
> I want to make it clear that the USACE Contracting Officer, the only person with the authority to modify the contract, at times chooses not to do something security related, chooses not to do something that is "better in the minds of security folks," and therefore ECC is not obligated to do it no matter what the SSM or CACI on-site personnel think or want. Contract Law supersedes security wants. If the Govt. wants to add security related scope, it will modify the contract to ECC accordingly, and ECC will flow down the modification to CACI accordingly. In earlier correspondence that we shared with you, the USACE Contracting Officer's letter to ECC, stated just that.
>
> . . . .
>
> Only USACE can modify the Contract documents. The SSM does not have the authority (nor does Patrick Cole) to

35

modify the contract documents, nor impose procedures that incur extra costs beyond those contemplated in the contract documents.

. . . .

To remove any doubt: If USACE is not going to formally modify ECC's contract and pay us (both ECC and CACI) for extra steps / extra security scope / extra people, then ECC is not going to modify CACI's contract nor will ECC pay CACI for extra steps, extra people, and extra security scope.

To remove any doubt: If a CACI representative influences or sells extra steps or extra people or extra scope to the SSM, and CACI follows the SSM direction and facilitates pushing ECC to comply, without a modification from the USACE Contracting Officer, and without ECC flowing down the modification to CACI, then CACI is at risk and exposed to bearing the financial burden, to include the cost of ECC's PM's/APM's time to manage conflict that CACI on site personnel bring into the project.

(Gov't supp. R4, tab 27b at 1, 3) (emphasis in original)

74. By letter dated November 28, 2018, ECCI submitted to Contracting Officer Nicholas Johnston a claim in the amount of $388,495, with the requisite CDA certification, for an alleged government change to the Contract, which required increased SSMS in areas contiguous to the CAA (62029 R4, tab 18 at 1-2). According to appellant "[t]he Government directed ECCI to monitor CAA Contiguous Areas within the 501st MI BDE HQ using CSTs when work was being performed regardless of whether this work involved activities that penetrated the CAA boundary" (62029 R4, tab 18 at 614). Appellant alleged that "[t]he Contract requires SSMS monitoring within the Contiguous Areas only when intrusive work penetrating the CAA boundary is performed" (id.).

75. On March 14, 2019, Mr. Johnson issued a final decision denying ECCI's November 28, 2018, certified claim (62029 R4, tab 1 at 1, 70). The contracting officer found that ECCI "was always required to monitor construction activities by uncleared workers in areas contiguous to the CAA with its SSMS subcontractor in order to satisfy its contractual responsibility 'to provide Site Security Monitoring Personnel (SSMP) to detect unauthorized access to controlled areas, to deter construction worker activities, preventing the implantation of clandestine surveillance devices or systems into

structures being constructed or its immediate surroundings'" (62029 R4, tab 1 at 2). The final decision also found that "[t]he SSM lacked authority to change the Contract" (62029 R4, tab 1 at 37). The final decision asserted that previously executed bilateral modifications were an accord and satisfaction that waived or settled ECCI's right to additional payment related to the appellant's contiguous space monitoring claim (62029 R4, tab 1 at 43-51).

<u>DECISION</u>

1. <u>ASBCA No. 61176</u>

Insofar as we can determine, this appeal presents an issue of first impression before the Board, namely, where the Contract states that the government will provide "Government-Furnished Site Security Monitoring" personnel and the government subsequently does not provide that personnel, whether the government's change to the Contract is a breach, entitling the contractor to increased costs allegedly incurred in performing work that the contractor believed would have been performed by government personnel. Appellant seeks additional compensation for hiring one additional CST and CAG as a result of the government not providing one CST and CAG on the project (app. br. at 9-10). Citing *Sauer, Inc., v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000), appellant argues that it "is entitled to an equitable adjustment for the increased costs incurred as a result of that change" (app. br. at 10). ECCI claims that, in preparing its price proposal, it relied upon the government's promise to furnish the personnel, and, thereby reduced its price (app. br. at 3, 10; findings 28-29).

The government denies entitlement, arguing that the one additional CST and CAG it was to provide "were intended by the Government to act solely in the role of management and oversight of the site security work, and not as employees to assist the Contractor" (gov't resp. at 8). As support, the government points to the responsibilities of the government CST and CAG specified in the Contract, noting they were limited to reviewing and coordinating activities, and did not include SSMS work appellant was contractually required to perform (gov't br. at 8-9, 20). The government likewise disputes ECCI's allegation that, in preparing its cost and technical proposals, it lowered its price in reliance upon the government's statement that it would provide one CST and one CAG (gov't br. at 28-29).

A. <u>The Government's Statement that It Would Provide Site Security Monitoring Personnel Did Not Relieve ECCI of Its Staffing Responsibilities</u>

The parties agree that the Contract specified the government would provide one CST and one CAG, that the government ultimately did not provide such personnel, and that this constituted a change to the Contract (finding 69; app br. at 7). The parties

disagree as to whether this is a compensable change.  To resolve this dispute, we turn first to the language of the Contract.

It is well established that "[c]ontract interpretation begins with the plain language of the agreement," *Foley Co. v. United States*, 11 F.3d 1032, 1034 (1993), and "the language of a contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965).  In addition, "[a]n interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

The Contract clause at issue here, entitled "Government Furnished Site Security Monitoring," specifies that the government would provide one CAG and one CST "for the duration of the construction activities."  As to the work the government personnel would perform, the clause specifies that "[t]he Government staff will be responsible for reviewing the scheduled construction activities and coordinating site security monitoring with contractor and contractor security staff."  (Finding 4)  The language is plain as to the responsibilities of the government staff.  The provision in no way states or even remotely suggests that part of the government personnel's responsibilities was performance of SSMS that the Contract required appellant perform.  As we discuss below, appellant proffers several arguments seeking to add language, caveat, and meaning to this clause, all of which is unwarranted or simply incorrect.

B.  The Provision Referencing "Government Furnished Site Security Monitoring" Personnel Does Not Change ECCI's Personnel Obligations Specified by the Contract

In support of its contention that the contract relieved it of responsibility for providing the two security employees, appellant seeks to equate government-furnished personnel with government-furnished property, stating "there is no basis whatsoever for the Government's assertion that the phrase 'government-furnished' takes on a wholly different and conflicting meaning in the context of personnel" (app. br. at 2-3, 15-16).  Yet, appellant cites no legal precedent to support its suggestion that government-furnished property is somehow equivalent to government-furnished personnel.  Moreover, appellant's argument is based upon a false premise, as the Contract does not contain the term "government-furnished personnel" (61176 R4, tabs 2-3) (*see* app. br. at 15 (stating, "this dispute concerns 'government-furnished' personnel, rather than property")) (app. resp. at 4, 7-8, 10, 13-14, 17) (referencing "government furnished personnel").

38

FAR 52.245-1, which is incorporated into the Contract, defines government-furnished property as including "spares and property furnished for repair, maintenance, overhaul, or modification" and "contractor-acquired property if the contractor-acquired property is a deliverable under a cost contract when accepted by the Government for continued use under the contract" (finding 47). Government property is defined as "all property owned or leased by the Government," including "material, equipment, special tooling, special test equipment, and real property" (*id.*). Neither definition identifies government personnel as a type of government-furnished property or government property (*id.*). We know of no government regulation that equates the two.[10]

We likewise have found no decision of the Court of Appeals for the Federal Circuit or this Board discussing the concept of "government-furnished personnel." The Comptroller General, however, has issued one decision, *IBM Global Bus. Servs.*, B-298833.4, B-298833.5, 2007 CPD ¶ 82 (Comp. Gen. Mar. 1, 2007), discussing the concept of government-furnished personnel in the context of a bid protest. Although decisions of the Comptroller General are not binding precedent on this Board, they may prove helpful by illustration of how another well-informed tribunal interprets the contractual provisions at issue. We find *IBM Global* to be worthy of consideration and examination because it provides a clear example of what the government does when it wishes to provide government personnel to work with contractor personnel on a contract.

In *IBM Global*, the Comptroller General denied a protest of a Department of the Air Force contract award for an Expeditionary Combat Support System (ECSS) System Integrator (SI), utilizing off-the-shelf software. The request for quotations (RFQ) specified that successful implementation of the system being procured "would require a partnership between the agency and the SI" and that "the parties anticipate a unique sharing of concerns, knowledge and ideas via a partnership whereby Government personnel are made available to provide a source of information, and to work side-by-side with the contractor." 2007 CPD ¶ 82 at 4.

One of the factors considered in awarding the contract was price, which was "comprised of the value of the task order plus the value of any government-furnished personnel and property." 2007 CPD ¶ 82 at 2. To account for any difference in the anticipated use of government personnel, the RFQ required vendors to complete a Government Personnel Matrix, which would be incorporated into the contract,

---

[10] FAR 45.000 likewise sets forth policies and procedures concerning government-furnished property, but contains no provisions concerning government-furnished personnel. 48 C.F.R. 45.000 (prescribing policies and procedures for providing government property to contractors and contractors' management and use of government property).

39

specifying by contract year the number of government personnel by experience level and the percentage of time required. The RFQ also specified the maximum amount of government personnel available per skill level, per contract year.

To analyze price, the RFQ stated:

> For each category of government personnel for each contract year, the matrix specified a cost per full-time equivalent (FTE) that would be added to the vendor's quoted price for purposes of the evaluation in order to "eliminate any competitive advantage resulting from the vendor's proposed use of Government Personnel."

2007 CPD ¶ 82 at 5. The RFQ also contained a provision by which the government was required to make personnel available in accordance with the Government Personnel Matrix, and whereby "the contractor 'shall be entitled to an equitable adjustment should the Government fail to make the required personnel available.'" 2007 CPD ¶ 82 at 5.[11]

In contrast, the Contract here contained no such provisions. Had it been the intent of the Contract that a contractor could utilize government personnel to perform its Contract work, the Solicitation specifically could have stated that government personnel were available to perform contractor work, as the contract did in *IBM Global*, and could have included provisions similar to the Air Force contract to "eliminate any competitive advantage resulting from the vendor's proposed use of Government Personnel." 2007 CPD ¶ 82 at 5. As we discuss more fully below, the fact that the Contract here contained no such express statements or provisions should have set off alarm bells for appellant, an experienced contractor, given its stated belief that it could utilize government personnel to perform its contract work, and given the Contract's failure to specify exactly how that would be accomplished.

> C. ECCI's Failure to Inquire Whether the Government Interpreted the Contract as It Did Was Unreasonable

---

[11] The protestor challenged the procurement upon the grounds that the Air Force lacked authority to contractually commit government personnel to work on the contract, but the Comptroller General rejected this challenge as untimely. The protestor likewise challenged the Air Force's capability to furnish the number of government personnel proposed. The Comptroller General rejected this challenge as well, holding that the record supported a finding that the government reasonably could conclude that it had sufficient resources to meet the proposed number of government personnel. 2007 CPD ¶ 82 at 5-6.

To receive an equitable adjustment to the Contract, ECCI must demonstrate that it reasonably relied upon its interpretation of the Contract. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987). Indeed, appellant notes in its brief that "a proper technique of contract interpretation is for the court to place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract" (app. br. at 16) (citing *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)). Placing ourselves in the shoes of such a contractor convinces us that ECCI's interpretation was unreasonable, as were its actions (or lack thereof) resulting from that interpretation.

The fact that the government included in the Contract a provision setting forth government-furnished site security monitoring is not, in and of itself, out of the ordinary. Mr. Fern, appellant's program manager, acknowledged that site security monitoring typically is a government function (finding 9). What is out of the ordinary – or "atypical" in the words of Mr. Fern (finding 9) – is that the contractor was responsible for SSMS, and "for hiring a security monitoring subcontractor to provide" SSMS (finding 2). Indeed, the record reflects that the USACE FED, unbeknownst to ECCI, received special dispensation from NSA to allow the contractor to provide SSMS (findings 40-43).

Assuming for the sake of argument that appellant, an experienced contractor "with more than 26 years of experience managing and executing in excess of $3.2 Billion in US Federal Government construction" (finding 20), and specifically Mr. Fern, truly believed that government personnel would be provided for the benefit of the contractor, ECCI, as a reasonable contractor, should have inquired from the government whether its understanding of the solicitation was correct. ECCI's argument that, although the government put appellant in charge of SSMS, the government agreed to provide to ECCI two employees (no more no less) to perform SSMS for ECCI – without any explanation of how this would work or any limitations on the work the government would provide – is nonsensical. This especially is true given that the Contract contained no provisions (like those referenced in *IBM Global*) to capture the cost impact of the government's performance of contractor work, or any guarantee that government personnel would be available to perform a set amount of contractor work. "Where a potential contractor is presented with a contract containing . . . an obvious omission, inconsistency, or discrepancy of significance" the contractor "must consult the Government's representatives if he intends to bridge the crevasse in his own favor." *HRH Constr. Corp. v. United States*, 192 Ct. Cl. 912, 920, 428 F.2d 1267, 1272 (1970).

According to Mr. Fern, "[i]f the RFP states to all offerors that the Government will provide one CAG and one CST, and with the function of a CAG and CST being well known to experienced secure construction contractors, then a prudent bidder in a competitive situation would have no choice but to remove one CAG and one CST

41

from their pricing" (finding 30) (appellant's August 14, 2014 letter contains a similar statement (finding 65)). Although we agree that ECCI is an experienced contractor, we disagree with its conclusion that it had "no choice" but to simply remove from its pricing one CAG and one CST. Given appellant's belief that the government's approach was "atypical," the reasonable choice would have been for appellant to raise with the government its interpretation and belief that "government-furnished personnel" were provided for the benefit of the contractor. Had it done so, "the dispute now in litigation would have come to light, and would have been appropriately resolved prior to the submission of bids. Having bridged the gap in its own favor without consulting the contracting officer prior to bidding, however, plaintiff is not entitled to recover here." *HRH Constr. Corp.*, 192 Ct. Cl. at 920, 428 F.2d at 1272. A reasonable contractor would have inquired about the issue presented, and would have specified in its proposal that, in preparing its cost estimate, it relied upon its interpretation of the RFP that the government would provide one government CST and CAG for use by the contractor in performing its SSMS duties.

D. Question and Answer No. 18 Do Not Satisfy ECCI's Duty to Inquire and Do Not Support ECCI's Interpretation of the Contract

Appellant suggests that a question asked during the procurement sufficiently raised the issue of how the contract provision at issue was to be interpreted to meet its duty to inquire, and that the government's response supports ECCI's favored interpretation (app. br. at 2; app. resp. at 6). Specifically, Question no. 18, submitted by another offeror, which asked "[h]ow many CSTs will the Government provide and have on-site" (finding 17). The government responded, "[i]n accordance with Section 01 31 00, per amendment 2, the Government will provide will provide 1 CAG and CST. The contractor is to provide additional CAGs and CSTs to meet the requirements of Site Security Monitoring Services (SSMS)." (*Id.*)

In its response brief, appellant argues that "it was reasonable for ECCI to interpret the Q&A provided by the Government to mean that it would not be required to provide 'all' CAGs and CSTs, but only those 'in addition to' those provided by the Government. To conclude otherwise would give no meaning to the Q&A response from the Government." (App. resp. at 6) Assigning misplaced import to the word "additional," appellant suggests "to the extent that there was any confusion or ambiguity regarding the obligations of the parties (which there was not), the Government confirmed that it would provide one CAG and CST, and the contractor would provide additional CAGs and CSTs as needed" (app. br. at 11). The fallacy with appellant's argument is its insertion of the qualifier "as needed," i.e., "the contractor would provide additional CAGS and CSTs *as needed*" (app. br. at 11) (emphasis added). Neither the Contract, nor the government's answer, states that the contractor is only to "provide additional CAGs and CSTs as needed" (app. br. at 11; findings 2, 4, 17). Indeed, the government's answer unambiguously concludes that

42

appellant is required "to meet the requirements of Site Security Monitoring Services (SSMS)" (finding 17).

Moreover, appellant's interpretation of the government's answer creates a conflict with two other Contract provisions. Both CLIN 0006 and Specification Section 01 31 00, paragraph 3.4, state that the contractor's SSMS "[s]ubcontractor shall furnish *all personnel*, tools, protective equipment and supplies *to provide SSMS* in accordance with rules, laws, regulations and security requirements as stated in the RFP documents" (findings 2, 4) (emphasis added). Appellant's interpretation – that offerors "would not be required to provide 'all' CAGs and CSTs," just "those 'in addition to'" the government CAG and CST – is at odds with this clear requirement of the Contract – that appellant's subcontractor was responsible to "furnish all personnel . . . to provide SSMS" (findings 2, 4).

Neither the Contract, nor the government's answer, limit the contractor's obligations to simply providing "additional CAGs and CSTs as needed" (app. br. at 11) (findings 2, 4, 17). The government's answer, and use of the word "additional," in no way establishes an agreement by to the government to make available its personnel to perform Contract work that appellant was required perform. We reject appellant's attempt to attribute greater legal significance to, and create government obligations out of, words that simply do not mean what appellant suggests.

E. The Government's Interpretation of the Contract is Reasonable

In addition to asserting that its contract interpretation is correct, ECCI challenges the reasonableness of the government's contract interpretation. In its opening brief appellant argues that "the government attempts to read language into the contract that does not exist" (app. br. at 9), questioning the government assertion "that the language in the Contract related to a Government Furnished CAG and CST was merely identifying personnel who were solely for the benefit of the Government, and could not be used by the Contractor" (app. br. at 12). The government, challenging appellant's allegation that the one CST and CAG were provided to perform work for the contractor, states that the Contract identified specific, limited responsibilities of the government CST and CAG, i.e., reviewing scheduled construction activities and coordinating site security monitoring (gov't br. at 8, 20).

As persuasively explained in Mr. Kim's August 7, 2014 letter and Ms. Billman's final decision, the duties assigned to the government CST and CAG, i.e., reviewing scheduled construction activities and coordinating site security monitoring, were tasks that were solely for the benefit of the government (findings 64, 69). That these task were solely for the government's benefit is evident in the Contract language – paragraph 3.3 of Specification 01 31 00 – which sets forth the government CST and CAG responsibilities as "reviewing the scheduled construction activities and

43

coordinating site security monitoring with contractor and contractor security staff" (finding 4). The Contract provision does not state that the government CST and CAG were to perform, or were available to perform, the contractor's SSMS work. The responsibilities assigned to the CST and CAG are as stated in the Contract, no more and no less.

In its response brief, appellant challenges the government's position that the role of the government CST and CAG was limited to "reviewing and coordinating activities," arguing the Contract "language does not include any limitation on the Government Furnished personnel providing site security management services" (app. resp. at 4; citing gov't br. at 8). We disagree. Again, as discussed above, the Contract contained an express limitation on the role of the government CST and CAG – reviewing scheduled construction activities and coordinating site security monitoring (finding 4).

In essence, appellant argues that, because the Contract did not contain any additional statement providing that the government CST and CAG were limited to reviewing scheduled construction activities and coordinating site security monitoring, the contractor was free to add responsibilities and direct government personnel to perform ECCI's contractual SSMS obligations. Appellant's argument is a *non-sequitur*, as it does not follow that, because the Contract did not include additional language further limiting the role of the government CST and CAG, appellant was free to expand the government's obligations and utilize government personnel to perform contractor work.

Appellant proffers also a second *non-sequitur*, arguing that, "[c]ontrary to the Government's assertion, the contract does not limit the responsibilities of the CAG and CST 'to reviewing and coordinating activities,'" because the Contract "clearly states that [the CAG and CST] would coordinate with ECCI and its security staff" (app. resp. at 4). The "coordination" specified in the Contract was the government coordinating site security monitoring with appellant in conjunction with the government's review of scheduled construction activities. Such coordination does not equate to an agreement that the government would perform some of ECCI's SSMS responsibilities as well.[12]

---

[12] Indeed, it is appellant, not the government, who seeks to add language to the Contract. ECCI argues that it planned to utilize the government CAG and CST "to review the scheduled construction activities, coordinate site security monitoring, and perform the SSMS work for the duration of the Contract" (app. br. at 3) (emphasis added). Paragraph 3.3 of Specification 01 31 00 (finding 4) makes no mention of the government CST and CAG "perform[ing] the SSMS work" (*id.*). Rather, it states that "[t]he Government staff will be responsible for reviewing the scheduled construction activities and coordinating site

44

F. ECCI's Technical Proposal Does Not Support a Finding that It Relied Upon Its Proffered Interpretation of the Contract When Making Its Bid

As discussed above, to receive an equitable adjustment, ECCI must demonstrate that it reasonably relied upon its interpretation of the Contract. *Stuyvesant Dredging*, 834 F.2d at 1581. ECCI argues that proof of its reliance is contained in its technical proposal.[13] According to appellant, its site security staffing plan was prepared "utilizing the CAG and the CST provided by the Government as part of the resources it planned to use to review the scheduled construction activities, coordinate site security monitoring, and perform the SSMS work for the duration of the Contract." Appellant asserts that evidence of "[t]his reliance was communicated through the Project Organizational Chart (Figure 1) . . . included in ECCI's Technical Proposal." (App. br. at 3; citing 61176 R4, tab 19 at 9; *see* finding 22).

The evidence that this chart allegedly conveys regarding appellant's intended use of government personnel is not evident from the text of the chart. In actuality, the opposite is true. Although the chart does list the three government positions of SSM, CST, and CAG, it does not indicate, or even suggest, that those three government personnel would perform SSMS work for appellant or on its behalf. The government personnel appear on the chart outside the box labeled "Site Security Monitoring Services," with the chart providing no link ("reporting" or "communication") between the government personnel and the contractor/subcontractor personnel. (Finding 22)

The Contract required offerors to submit a Project Organization Chart that depicted "how management, supervisory, and administrative functions will be performed" (finding 15). Had appellant intended that the government CST and CAG would perform SSMS work for appellant, the chart should have indicated a reporting or communication link between the government personnel and the contractor/subcontractor personnel. (Findings 15, 22, 26)

Likewise, although ECCI's technical proposal contained a detailed discussion of the work appellant anticipated its own personnel and subcontractor personnel would perform, the technical proposal provided no discussion of the SSMS work ECCI

---

security monitoring with contractor and contractor security staff" (finding 4) (emphasis added).

[13] ECCI also argues that this proof is found in its price proposal, and in the declaration of Mr. Fern, who states that he relied upon it (finding 28). The price proposal is addressed in the next section. Mr. Fern's declaration is addressed in the section below on the parties' contemporaneous understanding of the contract.

anticipated the government might perform on appellant's behalf, or how appellant might coordinate or schedule such work with the government (findings 20-26).[14]

Appellant faults the government for not identifying "any problems with ECCI's staffing approach in its proposal, despite clear indications from ECCI that it intended to utilize the Government Furnished CAG and CST in performance" (app. br. at 17). This argument is, at best, wishful thinking on the part of appellant. As we have found, appellant's technical proposal did not provide any indication, clear or otherwise, that ECCI intended to utilize government personnel in performing its contractual obligations (finding 26).

In its response brief, appellant argues that it "was under no obligation to reference the Government Furnished CAG and CST beyond including them in their execution plan as depicted in ECCI's Technical Proposal" (app. resp. at 7). However, whether appellant was obligated to provide more details in support of its reliance on the government's CAG and CST is beside the point: without those details, and as the proposal was written, it provides no evidence of reliance.

Even assuming for the sake of argument that the government would have allowed its personnel to perform Contract work for appellant, there would have been considerable uncertainty as to how that work would be assigned, how much work the government personnel actually would perform, and no guarantee of actual performance, without some specific agreement between the parties. Simply listing three government positions on the chart in ECCI's technical proposal, with no indication how those positions were to interact with the contractor or receive work assignments, was wholly insufficient to protect appellant's interests or to put the government on notice that appellant believed government personnel would be working for the contractor.

By not specifying in its technical proposal or inquiring from the government how much appellant could rely upon government personnel, and by not locking in a commitment from the government as to specific work government personnel could and would provide, appellant assumed the risk that government personnel might not perform any contractor work because the government personnel instead were performing Contract responsibilities specifically assigned to them.

Contrary to appellant's suggestion, "further reference[] by ECCI to the Government CAG and CST" in its technical proposal *was* necessary to insure that the

---

[14] Clairvoyance is neither a skill expected of government evaluators in reviewing proposals, nor are evaluators expected simply to foresee that an offeror reduced its price because it incorrectly believed government employees would perform work that the contractor otherwise would have been required to perform.

government was on notice of appellant's intent to utilize government personnel and insure that government personnel were available to perform the work appellant anticipated (app. resp. at 7). Appellant's silence on this issue, in light of its belief that government personnel would be available for whatever SSMS work the contractor specified, did not reflect the actions of a "reasonable and prudent contractor" (app. resp. at 6; citing *H.B. Mac, Inc.*, 153 F.3d at 1345).

G. ECCI's Price Proposal Does Not Support a Finding of Reliance by ECCI

Appellant argues that it "need not prove how much it reduced its cost proposal based on the Government Furnished CAG and CST – what matters is that it relied on those Government Furnished personnel when preparing its proposal, and incurred additional costs when the Government changed the Contract" (app. resp. at 8). The fact that appellant is unable to state specifically how much it allegedly reduced its Contract price in reliance upon its belief it could utilize the government's CST and CAG to perform appellant's SSMS obligations, is supportive of a finding that neither its technical nor price proposal truly reflected appellant's stated intent. Had appellant acted in a reasonable manner (assuming for the sake of argument the reasonableness of appellant's interpretation of the Contract) and made inquiry of the government, it would have received assurances as to the amount of work it could count on being performed by government personnel. In this case, the response presumably would have been "none." Although the amount sought by appellant is relevant to the issue of quantum, appellant's inability to state with specificity a dollar amount tied to the additional work it was required to perform, casts doubt upon appellant's alleged belief that government personnel would perform contractor work.

H. Contemporaneous Understanding of the Parties

Appellant argues that the government's current interpretation is in conflict with the contemporaneous understanding of the parties, citing *Reliable Contracting Grp., LLC v. Dept of Veterans Affairs*, 779 F.3d 1329, 1332 (Fed. Cir. 2015), *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982), and *Edinburgh Int'l*, ASBCA No. 58864, 16-1 BCA ¶ 36,227 at 176,743, for the proposition that a parties' contemporaneous interpretation of a contract is entitled to great weight (app. br. at 13-14, 16-18). Appellant's reliance upon these decisions is misplaced because appellant has not established, in the first instance, that the government's current position is in conflict with a position it held at the time of Contract award.

As proof of the government's alleged contemporaneous understanding of the Contract, appellant cites not to contemporaneous documentation or statements from the parties, but, rather, deposition testimony of Contracting Officer Mr. Michael Miyagi taken long after Contract completion. Mr. Miyagi's testimony does not establish what appellant suggests. For example, appellant notes that, when

47

asked "what is your understanding of when the government puts in a contract 'government-furnished,'" Mr. Miyagi stated, "[w]hatever it says in the title, government-furnished, [the government] will furnish this equipment or product" for the use of the contractor in performing the contract. (App. br. at 13-14; app. supp. R4, tab 5 at 16).[15]  Mr. Miyagi's was asked a general question – "*what is your understanding*" – not *what was* your understanding of the relevant Contract provision *at the time of Contract award*.  Moreover, Mr. Miyagi's cited testimony speaks to "equipment or product," not government personnel (*id*.).

When asked "[f]rom what it says in the contract, is it your understanding that the contract is providing that the government is going to furnish these people for the contractor to use in performing the work," Mr. Miyagi responded, "at this time, yes. I see it as a – it says the government shall provide, one.  It's specific on here . . . So, you know, whatever the contract says, it's specific." (App. supp. R4, tab 5 at 18)  While the contracting officer's response is not a model of clarity, it in no way suggests a contemporaneous interpretation of the Contract by Mr. Miyagi that at the time of award the government would furnish personnel "for the contractor to use in performing the work" (*id*.).  Indeed, Mr. Miyagi stated in his deposition that he was not involved in preparing the relevant specification at issue here (app. supp. R4, tab 5 at 15).  Appellant cites no testimony demonstrating Mr. Miyagi's understanding at the time of Contract award and the deposition testimony cited is insufficient to carry appellant's burden of establishing the government's contemporaneous understanding of the Contract.

The government likewise challenges appellant's contemporaneous understanding of the Contract with regard to the contractor's intent to utilize the government CAG and CST.  Citing documents issued by ECCI and its subcontractor in February and May 2013, setting forth their respective site security plans, the Government notes that neither document contains any "mention of a government-provided CAG or CST or how they would be used" (gov't br. at 24-25).  The government is correct.  Neither ECCI's CSMP, nor CACI's SSP, contain any discussion of the government CAG or CST, or how government personnel might be utilized by ECCI or CACI in performing its SSMS obligations (findings 54, 56), thus calling into question ECCI's and CACI's true intent with regard to utilizing government personnel to perform contractor/subcontractor functions.

Although Mr. Fern's declaration states his recollection that appellant's proposal reflected his "interpretation of the RFP that ECCI could and would use the

_____

[15] Appellant also references the following question and answer, "So is the government furnishing it for the use of the contractor in performing the contract?"  To which Mr. Miyagi responded, "[a]ccording to the contract itself, yes."  (App. br. at 14)

Government CAG and CST to perform some of the site security monitoring services, and the bid cost for such work was thereby reduced accordingly," (finding 28), the lack of contemporaneous documentation supporting this statement suggests otherwise (*see* findings 26 (appellant's technical proposal), 27 (appellant's price proposal), 30 (interrogatory answer stating "a trend log of detailed changes that were made prior to submission of our original bid were not documented for the record"), 37 (appellant's revised price proposal).[16]

## I. The Contract's Identification of Government Personnel is Not Superfluous

ECCI argues that if paragraph 3.3 of Specification 01 31 00 "was intended to refer to Government personnel available solely for the benefit of the Government, there would have been no reason whatsoever to include that language in the Contract" because "[t]he Government is under no obligation to provide contractors with a list of all personnel that the Government will use to administer the Contract" (app. br. at 13). Appellant concludes, "[t]he only reason to include that language was to inform contractors that two individuals would be made available by the Government to assist the contractor in performing its obligations" (*id*.). Appellant provides no legal authority in support of its conclusion, and simply saying it does not make it so. *Matcon Diamond, Inc.*, ASBCA No. 59637, 20-1 BCA ¶ 37,532 at 182,260. Perhaps ECCI is arguing that including the provision would be superfluous if it were not intended to convey that the contractor could use these personnel to supplement its own, and it is best to avoid an interpretation of the contract that makes portions of it meaningless or superfluous. *See Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922. But this portion is not meaningless, for it provides information to the potential contractor about how execution of the contract will be organized. Indeed, the Contract includes other references to government personnel assigned to work on the project, including the Project Manager, the COR, and the SSM (61176 R4, tab 6 at 13). The fact that the Contract identifies personnel assigned to the project does not equate to a promise by the government that the personnel it identifies would thereby be available to perform appellant's contractual obligations.

## J. Patent Ambiguity

The government argues that, assuming appellant's Contract interpretation were deemed reasonable, appellant's interpretation would create a patent ambiguity, imposing upon appellant a duty of inquiry (gov't br. at 31). As discussed above, appellant's interpretation of the RFP raises several questions for which it should have sought clarification from the government during the solicitation process. Indeed, the

---

[16] For these reasons, we also do not find Mr. Fern's declaration as supporting a finding that ECCI reasonably relied upon its interpretation of the contract when it bid the project.

number of questions raised by appellant's interpretation indicates the unreasonableness of its interpretation. Appellant's failure to raise the issues during the procurement also suggests that perhaps appellant did not hold then its interpretation of the RFP that it now advocates. Nonetheless, assuming for the sake of argument the reasonableness of its interpretation, we find that appellant's interpretation created a patent ambiguity, thus imposing upon it the duty of inquiry. *Interwest Constr. v. Brown*, 29 F.3d 611, 615-116 (Fed. Cir. 1994).

The government argues that appellant's "interpretation is in direct contradiction to the specific terms of the Contract that stated that it was the contractor's primary responsibility to provide the Site Security Monitoring Personnel (SSMP) and included the full range of duties for those positions in a section limited to the contractor's responsibility" (gov't br. at 32-33). In response, appellant asserts that the Contract "specifically references the contractor's *primary* responsibility to provide SSMP, and it does not state that it is the *sole* responsibility of the contractor to provide all SSMP" (app. resp. at 14) (emphasis supplied by appellant).

Appellant's argument reads the term "primary responsibility" out of context. The Contract states that "[t]he primary responsibility of the contractor is to provide Site Security Monitoring Personnel (SSMP) to detect unauthorized access to controlled areas, to deter construction worker activities, preventing the implantation of clandestine surveillance devices or systems into structures being constructed or its immediate surroundings" (finding 4). It in no way addresses a demarcation of SSMS responsibilities between the government and the contractor. Rather, it addresses the primary responsibility of the contractor with regard to specific SSMS tasks appellant must perform.

We agree with the government that, assuming the reasonableness of appellant's interpretation, it created a patent ambiguity, imposing upon ECCI the duty to inquire. *Southwest Marine, Inc.*, ASBCA No. 53561, 02-1 BCA ¶ 31,834 at 157,280. The Contract contained no provision specifying how much of appellant's SSMS obligations the government allegedly would perform or how that work would be assigned. By not inquiring about the specific work appellant believed the government personnel would perform, and by not seeking a corresponding commitment from the government, appellant assumed the risk that its interpretation was incorrect and that government personnel would not perform any contractor work.

### K. Conclusion – ASBCA No. 61176

Appellant's claim in ASBCA No. 61176 is denied. Because we find that appellant is not entitled to its increased costs allegedly incurred in performing work that it believes should have been performed by government personnel, we need not address additional arguments raised by the government in support of such a finding,

50

including whether appellant's claim, or a portion of its claim, is barred by accord and satisfaction because of the parties' modifications to the Contract (findings 57-62). We likewise do not reach the issue of quantum.

### 2. ASBCA No. 62029

This appeal seeks additional costs allegedly incurred in performing changed work to the Contract, thereby raising an issue of contract interpretation. Appellant argues the existence of a compensable change because it "was directed to perform security services in additional areas, specifically, areas contiguous to those where security was required by the Labor Synchronization Security Matrix that did not involve work that penetrated the Classified Area boundary" (app. br. at 27).[17] As explained below, we hold that the work was within the scope of the contract. In addition, we decide that even if the work required was outside of the scope of the contract, the government employee who allegedly directed the change had no authority to do so.

### A. Appellant's Notification of Change – Scope of Contract Work

By letter dated March 14, 2014, ECCI submitted a "Notification of Change," requesting clarification of the scope of CST monitoring in the CAA contiguous space (finding 71). ECCI argues that the Labor Matrix established the SSMS scope of work, providing "specific requirements for CSTs in various Classified Areas of the work and did not require CSTs in various Unclassified Areas of the work," except when that work penetrated the walls of the CAA (app. br. at 3, 23, 26-27). In its claim, appellant phrased its dispute as seeking costs for the use of CAGs[18] "to monitor areas surrounding the walls and ceiling of the Controlled Access Area (CAA Contiguous Areas) when work was not being performed that involved [sic] penetrated the boundary" (62029 R4, tab 18 at 614) (parenthetical information in original).[19]

---

[17] The Labor Matrix contains no caveat regarding "work that penetrated the walls of the Classified Area Boundary," nor does the word "penetration" appear anywhere within the Labor Matrix (62029 R4, tab 3 at 45-48).

[18] Appellant's claim states that "[a]s a cost saving approach, ECCI suggested using CAGs to monitor the CAA Contiguous Areas as the SSMS personnel in this case were intended to be used as a deterrent to prevent tampering with the CAA boundary versus serving in the more typical role of a CST of monitoring construction activities" (62029 R4, tab 18 at 614).

[19] Appellant's briefs do not contain any discussion of ECCI's understanding or interpretation of the term "penetration," or present any legal or contractual basis for ECCI's apparent understanding of that term. The only mention of the term in ECCI's briefs appears in appellant's statement of facts, wherein appellant states "that it estimated its CAG and CST costs based upon providing security

51

In response to appellant's Notification of Change, the contracting officer, by letter dated June 23, 2014, informed appellant that "ECCI should continue to utilize the CSTs according to contract requirements for monitoring of the actual construction performed by un-cleared workers within the CAA and when work is being performed that penetrates the CAA perimeter wall" (finding 72). The contracting officer stated also that "CST should be utilized to monitor the CAA space as well as areas contiguous to the CAA space that penetrate the perimeter walls, windows, doors, ceiling and floor" (*id.*). Thus, the contracting officer specified that ECCI should follow the Contract requirements for monitoring construction by un-cleared workers, with CSTs monitoring CAA space and contiguous areas that penetrate the CAA perimeter. Appellant's claim recognized that the contracting officer's letter clarified the Contract requirements (62029 R4, tab 18 at 10).[20]

Responding to the allegation in ECCI's complaint that the Labor Matrix "'clearly defined' where SSMS were required to be performed by CSTs (i.e. within the 'SCIF/Classified Areas') . . ." (gov't br. at 45; citing gov't supp. R4, tab 20 at 2), the government notes that "[t]he word 'within' is not used at all in that Matrix to limit monitoring to within the SCIF or Classified Areas," and that "the Matrix simply offers a chart showing labor ratios under tables with the captions 'Type Laborer – SCIF/Classified Area' and 'Type Laborer – Unclass Areas'" (gov't br. at 46; citing 62029 R4, tab 3 at 45-48). The government concludes that appellant's reliance upon "captions in this chart to argue that site security monitoring was only required 'within' the SCIF/ Classified Areas, is an unreasonable interpretation of this heading" (gov't br. at 46).

---

oversight for work in the Classified Areas shown on the Labor Security Synchronization Matrix, and for when penetrations through walls of the Classified Areas would occur" (app. br. at 23).

[20] In his declaration, Mr. Fern states that Mr. Kim's letter informed "ECCI that SSMP had to monitor work in the SCIF/Classified Area and when penetrations were made into those areas" (app. supp. R4, tab 1 at 33). According to Mr. Fern, "[t]his position . . . was consistent with the requirements of the Contract" (*id.*). We note that at page 16 of its claim, appellant appears to assert the opposite, stating that Mr. Kim's June 23rd letter instructed that CST "should monitor work in contiguous areas even when work was NOT penetrating the CAA perimeter" which, appellant alleged, is a "clear deviation from the Contract requirements" (62029 R4, tab 18 at 16). Regardless, this apparent inconsistency in appellant's position is of no consequence in these appeals because appellant does not argue in its briefs that statements contained in Mr. Kim's June 23rd letter were a change to the Contract. Rather, appellant's Contract change argument is based upon alleged direction by the SSM (app. br. at 24, 26).

We agree. In defining the terms and requirements of the Labor Matrix, ECCI's addition of the word "within," improperly seeks to limit the work appellant was required to perform. As noted by the government, "the law of contract interpretation is clear that contracts cannot be rewritten after the fact to insert words that were never agreed to by the parties" (gov't br. at 46 (citing *George Hyman Constr. Co. v. United States*, 832 F. 2d 574, 581 (Fed. Cir. 1987))). Indeed, the word "within" appears only two times in the Labor Matrix in a distinctly-different context, first, in describing the Substructure Build-Out, i.e., "[t]his system includes all structural slabs, and decks and supports within basements and above grade," and, second, in describing the Plumbing Rough-Out, i.e., "[a]ll water supply and waste items within the building" (62029 R4, tab 3 at 45-46). We reject appellant's suggestion that the Labor Matrix clearly indicated that SSMS was to be performed by CSTs only within the SCIF/Classified Areas.

The government likewise notes that "ECCI's interpretation is in conflict with the broader stated contract duties to monitor the structure and its 'immediate surroundings' and to monitor the construction workers 'as they accomplish various tasks'" (gov't br. at 46; findings 4, 8). As support, the government relies, in part, on ICS 705-1 which specifies "SSM may require cleared escorts or CSTs for non-cleared workers performing work exterior to the SCIF that may affect SCIF security" and "[t]his provision for monitoring work exterior to the SCIF 'that may affect SCIF security' is, again, broader than the limited interpretation advanced by ECCI" (gov't br. at 44-45; finding 10), Appellant's responsive brief fails to address the import of this argument. The government is correct. SSMS work required in contiguous areas was within the scope of the contract.

Appellant also relies upon deposition testimony of Administrative Contracting officer Steve Kim to support its argument. Appellant asserts that "[t]he directive to perform SSMS work beyond the terms of the Contract was a change under the Changes Clause, a fact even acknowledged by the Government's ACO" (app. br. at 26; citing app. supp. R4, tab 4 at 38-39). However, Mr. Kim's testimony does not support appellant's argument. Mr. Kim did not testify that "the directive to perform SSMS work beyond the terms of the Contract was a change under the Changes Clause" (*id.*). Rather, Mr. Kim was asked "if during the course of the work the government required ECCI to provide security in areas that were not classified and did not require that CST oversight, would you consider that to be a change to the contract?" (app. supp. R4, tab 4 at 38). To which, Mr. Kim answered "Yes" (*id.* at 39).

Mr. Kim was asked a hypothetical question. Mr. Kim's testimony does not "acknowledge" that the government here directed appellant "to perform SSMS work beyond the terms of the contract." Indeed, Mr. Kim was asked "[d]o you have any personal recollection of whether the government actually did require the CST

53

oversight in unclassified areas that didn't require it according to the labor security synchronization matrix?" In response, Mr. Kim stated, "[n]o recollection." (App. supp. R4, tab 4 at 39) Appellant's allegation that a government contracting officer "acknowledged" that the government directed appellant to perform SSMS work that was "beyond the terms of the Contract" and "a change under the Changes Clause" is simply incorrect.

### B. Question and Answer No. 40.c

In an attempt to bolster its argument, appellant cites to Solicitation question and answer no. 40.c, regarding "temporary security facilities," wherein an offeror inquired whether "under the supervision of the CST – ROK[21] labor or ROK subcontractors are allowed to perform other works for temporary security facilities, such as chain link fence for the SSA and project site perimeter and Site Security Manager Office" (app. br. at 24; finding 19). The government's answer instructs offerors to "follow Specification Section 010052 for temporary security requirements," noting that "[t]his work in general does not require CST oversight as stated in the Division 1 Construction Security Specifications" (finding 19). Offerors were instructed to "[p]lease follow the Labor Synchronization Matrix as it shows ROK Labor and US Cleared Labor Responsibilities" (*id.*).

Appellant argues that, "[i]n preparing its proposal, ECCI reasonably took USACE FED's response to Question Number 40.c at face value to mean that CAG and CST monitoring of construction work would not be required in the 'Unclass Areas' listed in the Labor Security Synchronization Matrix" (app. br. at 24). The fallacy with appellant's position is that question and answer no. 40.c deals with Specification Section 010052, "Temporary Security Facilities and Controls," and not the permanent structures being constructed, to which there was concern about "the implantation of clandestine surveillance devices" (61176 R4, tab 3 at 55, 118).[22] As noted by the government, "ECCI's professed reliance is not supported by the Government's answer, which clearly was directed to 'temporary security requirements' such as the 'chain link fence for the SSA and project site perimeter and Site Security Manager Office,' and not the main project site involving the permanent construction" (gov't resp. at 9). We agree. Appellant's reliance upon and interpretation of question and answer no. 40.c as a basis to conclude that SSMS were to be performed by CSTs only within the SCIF/Classified Areas is unreasonable.

---

[21] We assume that this acronym meant Republic of Korea.

[22] Question no. 35.b asked "[a]s this project involves SCIF and Temporary Security Facility, are these still considered 'classified areas'?" The government responded that "[t]he SCIF is a Classified Area and the Temporary Security Facility is not a Classified Area." (Finding 18)

54

C.  Notification of Change – SSM Authority

In its March 14, 2014, Notification of Change, ECCI also raised the issue of "SSM authority," and complained that the standards set forth in ICD 705-1 were "not being enforced on-site by the Government's Site Security Managers," which ECCI considered a changed condition.  (Finding 71)[23]  The contracting officer's letter dated June 23, 2014, informed appellant in no uncertain terms that "[t]he site security manager does not have authorization to request changes to the contract requirements" (finding 72).  This should have resolved the matter.  Indeed, it is well established that "[t]he Government is not bound by unauthorized acts of its officers or agents," and "[w]here limitations on the authority of representatives of the contracting officer have been communicated to the contractor, the contractor acts as a volunteer in following an alleged directive and is not entitled to recover from the Government any resulting increased costs."  *Metric Constructors, Inc.*, ASBCA No. 49374, 96-2 BCA ¶ 28,418 at 141,948.

Yet, in its brief, appellant argues that the government "SSM directed ECCI to perform security oversight in all areas contiguous to Classified Areas, at all times," and that the SSM "had contractual authority to oversee and direct performance of all SSMS work by ECCI" (app. br. at 24).  As support, appellant cites Specification Section 010041, "Construction Security," paragraph 1.04(A), which requires the contractor to "[p]erform required security work when directed by the COR or SSM" (finding 12).

Appellant is correct that paragraph 1.04(A) requires ECCI to perform security work directed by the government SSM.  However, this requirement is tempered by other Contract language which states "[o]nly a warranted Contracting Officer . . . has the authority to issue modifications or otherwise change the terms and conditions of this contract," and that "[i]f an individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract you shall not proceed with

---

[23] Appellant's briefs do not address enforcement of ICD 705-1 standards, other than in a reference to an email dated March 12, 2014, regarding negotiation of a modification, in which an ECCI employee states "there are the usual Contract vs. CSP vs. ICD-705- vs. 'made up rules as they went along' deviations" (app. br. at 4 (citing app. supp. tab 4 at 15)).  In contrast, the government references the technical specifications issued pursuant to ICS 705-1, stating that Chapter 4, paragraph D.7.m, provides "for monitoring work exterior to the SCIF 'that may affect SCIF security'" (gov't br. at 45 (citing 62029 R4, tab 18 at 225)); finding 10).  The government correctly notes this requirement is "broader than the limited interpretation advanced by ECCI – that monitoring is only required where there is actual penetration of a SCIF wall or work abutting it (gov't br. at 45).

the change and shall immediately notify the Contracting Officer" (finding 48).[24] The Contract unambiguously placed appellant on notice that only the contracting officer was authorized to change the terms of the Contract.

Appellant acknowledges this clause regarding the contracting officer's authority, and even notes that it acted pursuant to the clause by submitting its Notification of Change to the contracting officer (finding 71). Yet, appellant's claim alleges that "[d]espite the ACO's attempt to clarify the requirements, the USACE FED project team continued to enforce the SSMP requirements stipulated in the CSP that goes beyond the Contract to include monitoring of CAA Contiguous Areas regardless of whether CAA boundary penetration work is being performed or not" (62029 R4, tab 18 at 10).

The record establishes that the contracting officer informed appellant, in response to appellant's inquiry on the subject, that the SSM lacked authority to direct a change to the Contract (finding 72). Any further action by appellant, based upon the SSM's direction on this issue, was at its own peril. If a contractor informs the government of an alleged change to the contract, and the government responds that the individual responsible for the alleged change lacks authority to modify the contract, the contractor is not then free to simply ignore the government's response, perform the work directed by the unauthorized government employee, and later seek compensation for that work. *Sol Flores Const., Div. of Floresol and Co.*, ASBCA Nos. 32278, 32726, 89-3 BCA ¶ 22,154 at 111,506-07 (contractor "was not free to ignore the direction of the contracting officer and accept the directions of the TRCO [technical representative of the contracting officer]. The TRCO had no authority to overrule the contracting officer").

Moreover, it is abundantly clear from the record that ECCI, during Contract performance, appreciated the dichotomy between SSM authority and contract change authority, as expressed by Mr. Greg Joyce, ECCI Senior Program Manager, in a March 22, 2015, email to ECCI's SSMS subcontractor (finding 73). In that email, Mr. Joyce informed CACI that "Contract Law supersedes security wants" and if the government "wants to add security related scope, it will modify the contract to ECC accordingly, and ECC will flow down the modification to CACI accordingly. In earlier correspondence that we shared with you, the USACE Contracting Officer's

---

[24] According to appellant, the government's brief "fails to recognize that ECCI complied with this clause and notified the Government's ACO of the change" (app. resp. at 19). We disagree. In its Proposed Findings of Fact, Appendix A, the government discussed appellant's March 14, 2014, letter, and noted that the contracting officer responded to the letter, stating "[t]he site security manager does not have authorization to request changes to the contract requirements" (gov't proposed findings of fact at 47).

letter to ECC, stated just that." (*Id.*) Mr. Joyce cautioned that "[o]nly USACE can modify the Contract documents. The SSM does not have the authority . . . to modify the contract documents, nor impose procedures that incur extra costs beyond those contemplated in the contract documents." (*Id.*)

### D.  Constructive Notice of Change

Appellant argues, presumably in the alternative, that the government was on constructive notice of the alleged change to the Contract, stating that "formal written notice is not the only way to satisfy contractual notice requirements" (app. resp. at 19).[25]  As support, appellant asserts that "the Government's SSM prepared a daily log of work and acknowledged in that document that the security oversight was to be performed in the contiguous areas" (app. resp. at 19-20).  According to appellant, "[t]here can be no doubt that the Government's security manager's daily log was an official contract record available for the contracting officials to review" (app. resp. at 20).  Appellant offers no evidence that "contracting officials" actually reviewed these logs.  Of course, appellant's argument is rendered even more tenuous by the contracting officer's explicit admonition to ECCI that the SSM did not have authority to change the contract (finding 72).

### E.  Conclusion – ASBCA No. 62029

Appellant's claim in ASBCA No. 62029 is denied.  Because we find that appellant is not entitled to its increased costs allegedly incurred in performing work in areas contiguous to the CAA, we need not address whether appellant's claim, or a portion of the claim, is barred by accord and satisfaction because of the parties' modifications to the Contract (findings 57-62), and we do not reach the issue of quantum, the sufficiency of appellant's proof, or its bearing, if any, on the issue of entitlement.

---

[25] Appellant cites two decisions of the Court of Federal Claims, neither of which are binding precedent on the ASBCA, for the general propositions that imposition of notice requirements require "a certain measure of flexibility," *K-Con Bldg. Sys., Inc. v. United States*, 131 Fed. Cl. 275, 321–22 (2017), and "notice need not be in any particular form," *Engineered Maint. Servs., v. United States*, 55 Fed. Cl. 637, 641 (2003).  Neither decision advances appellant's cause, given that appellant submitted in writing a Notification of Change pursuant to FAR 52.243-4, to which the contracting officer then responded (findings 63-64).

CONCLUSION

For the reasons stated above, the appeals are denied.

Dated: March 22, 2021

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61176, 62029, Appeals of ECC International LLC, rendered in conformance with the Board's Charter.

Dated:  March 23, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
